Elzea SHIRLEY, Appellant,

v.

Donald NORFLEET, Respondent.

No. 46337.

Supreme Court of Missouri,

Division No. 1.

July 14, 1958.

Motion for Rehearing or to Transfer to Court en Banc Denied Sept. 8, 1958.

Keyes, Bushman & Hearne, Sam Bushman, John L. Hearne, Jefferson City, for plaintiff.

Rozier, Carson & Nacy, Jefferson City, for respondent.

DALTON, Judge.

Action for $75,000 damages for personal injuries alleged to have been sustained by reason of defendant's negligence. The cause was tried to the court, without the aid of a jury, and judgment was entered for defendant. Plaintiff has appealed.

The accident happened on September 30, 1952, about 3:20 p. m. on Highway No. 17, within one mile south of the junction of U. S. Highway No. 54 with State Highway No. 17. All of the parties, hereinafter mentioned, were returning from a baseball game at Parker Henley field on U. S. Highway No. 54 about a mile west of the

mentioned junction. Some 150 persons from Eugene and vicinity had attended the game. Transportation was provided by fifteen to twenty automobiles and several school buses. The weather was clear and warm and the highway dry. The title to the automobile in which plaintiff was riding stood in her name and it was being operated by her son, Lyndal Shirley, who was seventeen years old at that time.

Immediately before the difficulty, three automobiles and a school bus, returning from the ball game, were traveling south from the mentioned junction on Highway No. 17. The school bus was in the lead, followed by a 1939 Mercury (Spalding's), a 1948 Plymouth (defendant's), and a 1949 Buick (plaintiff's). They were moving down a long hill which had about a 7% downgrade. The road was black-topped, 20 to 22 feet in width. It sloped from the center to the sides and there were sloping earth shoulders 5 to 6 feet in width and grass covered. After the first three feet, the shoulders sloped at about a 45 degree angle. The road extended almost straight south and, near the foot of the hill the area was rolling and there were two humps or crests with dips to the north of each where the view of traffic ahead was obstructed for a short distance by the crest ahead. The two crests are approximately 1,100 feet apart. The accident happened on the south slope of the second crest near a culvert at a point approximately 4,400 feet south of the mentioned junction.

As the traffic moved south, the Mercury, the Plymouth and the Buick passed to the left of the school bus in the order mentioned and then the driver of plaintiff's Buick remained on the left side of the highway and undertook to also pass both the Plymouth and the Mercury which were ahead of him. Before plaintiff's automobile reached the defendant's, the defendant (the driver of the Plymouth) turned his automobile to the left side of the highway and undertook to pass and did pass the Mercury (Spalding's) which was ahead of him. Plaintiff's son (in order to avoid a collision with defendant's Plymouth) turned her automobile to the left shoulder of the highway and ultimately collided with a bank, a fence and a telephone pole, and plaintiff was injured. There was no contact between the automobiles.

Before reviewing the evidence in more detail we should refer to the pleaded assignments of negligence and contributory negligence. In her petition plaintiff charged defendant with primary negligence as follows: (1) failing to drive his automobile as close to the right-hand side of the highway as practicable; (2) failing to drive to his right of the center of the highway; (3) failing to turn as far to the right as reasonably possible in order to allow free passage on his left of plaintiff's automobile overtaking and starting to pass defendant's automobile; (4) turning to the left into and across the path of plaintiff's automobile; (5) failing to slow his automobile or turn it to his right; (6) changing the direction of travel from a straight course and turning to the left, when such movement could not be made with reasonable safety, and without signaling his intention to turn to the left; (7) turning to the left and undertaking to pass the automobile ahead of him without ascertaining whether there was traffic behind starting to pass defendant's automobile; and (8) failing to keep a lookout, when by doing so he could have seen plaintiff's automobile in time to avoid the collision by turning to the right of the center of the highway, turning to his right or by slowing his automobile. Plaintiff further pleaded humanitarian negligence in that after imminent peril arose, and after defendant saw or could have seen plaintiff in peril, the defendant (with the means at hand and with reasonable safety to himself and others) could have avoided the collision by driving to the right of the center of the highway, by turning to the right or by slowing his automobile.

Defendant in his answer charged plaintiff with various acts of contributory negligence, including failing to drive to the

right of the center of the highway, or as close to the right-hand side of the highway as practicable; failing to have her automobile under control at the time and place; driving her automobile at a high and dangerous rate of speed under the circumstances; and driving at a high and dangerous rate of speed so as to endanger the life and limb and property of others and of this defendant.

The oral testimony of the participants and other witnesses concerning the detailed facts and circumstances attending the receipt of plaintiff's injuries present many conflicts. Plaintiff herself had no memory of events preceding the collision. Her principal witness was her son Lyndal, whose testimony tended to show that, as the automobiles moved south on Highway No. 17, the speed of the school bus was 20 or 25 miles per hour; and that the automobiles of Spalding, defendant and plaintiff passed it. Lyndal said he passed the school bus shortly after leaving U. S. Highway No. 54. When plaintiff's automobile passed the school bus, Spalding was at the bottom of the first dip (the foot of the hill). Spalding was three or four car lengths ahead of defendant and defendant was four car lengths in front of plaintiff. Lyndal could see about one mile ahead—straight and down hill. There was no approaching traffic. As he passed around the bus his speed was about 55 to 60 miles per hour; and that of defendant and Spalding, ahead of him, was then 45 to 50 miles per hour. He also said that he passed around the school bus at 40–45 miles per hour and then increased his speed to 55–60 miles per hour as he came down the first hill; and that he then increased to 70 miles per hour.

When Lyndal passed the bus, he had decided to pass both the defendant's and Spalding's automobiles and he did not return to the right side of the highway. He testified: "Well, I stayed in my left lane going down 17, and as I went over the first little hump at the bottom of the hill I was gaining on the other two cars and as I come up over the second hump, I increased my speed a little bit, and as I came over the hump I sounded my horn a couple of times, and I seen Kelan (Spalding) and Donny (defendant) in front of me, and as I was starting to pass, why, Donny turned out to the left to pass Kelan, and I took to the shoulder to keep from hitting him."

When Lyndal came over the second hump, he could see both the defendant's and Spalding's automobiles on their own right-hand side of the highway about a car's length apart. Lyndal was operating plaintiff's automobile at 70 miles per hour and he was not over 10 feet behind defendant's automobile, as he came over the top of the second hump. He also fixed the distance between the cars at two car-lengths. He also said that after he passed the school bus and determined to pass both defendant and Spalding, he passed over the second crest 25 feet behind defendant and, at a point 50 feet further down the south slope of the second hump, he was within 10 feet of defendant's automobile, when defendant pulled to the left side of the highway to pass the Spalding automobile; that defendant's automobile and the Spalding automobile were each then doing approximately 50 miles per hour when Lyndal started to pass; that defendant gave no signal of any kind (hand or light) of his intention to turn to the left; that he (Lyndal) had accelerated his speed, when he decided to pass around the two automobiles ahead; that, when defendant pulled out in front of him, he (Lyndal) turned to the left to the shoulder and did not look or observe further the movements of defendant's automobile. He proceeded down the shoulder 100 feet, jumped a culvert and hit a bank; and that the automobile proceeded about 100 feet further after he left the highway.

Lyndal further testified that he was thoroughly familiar with the automobile he was driving; that he knew it had good brakes; and that the windows on his side of the car were down. When defendant pulled

to the left side of the highway, Lyndal applied his brakes for about 5 feet on the highway, and he then released them and did not apply his brakes again after he was on the shoulder. He maintained about the same speed of 70 miles per hour on the shoulder, until his automobile jumped the culvert or ditch. The thing that prevented his returning to the road was not speed, but was the slope of the shoulder, as it would be hard to pull back, and because "when you would pull back upon the road, why, your tail end would come back around." He held the automobile as straight as he could on the shoulder and was trying to get back on the pavement.

LeRoy James Sommerer, who was almost sixteen years of age at the time in question and a passenger in the Spalding automobile, testified on behalf of plaintiff, and said Spalding was driving at between 40 and 50 miles per hour and that, "As I recall it, whenever I looked back out of the rear window of Kelan's (Spalding's) car, I seen Donny (defendant) following Kelan's (Spalding's) car, and of course Donny (defendant) started to pass. I don't know how far across the center line he was in comparison to left and right side of the road. I don't know if he was farther to the right or farther to the left. It seems to me like I also caught a glimpse of the Shirley (plaintiff's) vehicle coming down the left-hand side of 17 towards Eugene. * * * I think—I think Kelan's car was going downhill. I imagine the other two were either at the top of this grade or else coming down hill also. * * * Well, Donny (defendant) continued to pass the Spalding vehicle, and the way I looked at it, there was no place for Lyndal to go except— * * * (he) tried to stay on the shoulder, but he couldn't keep it there; or there wasn't room for both cars. So he took off to the ditch and jumped the culvert * * * I know I seen the Norfleet car and it seems as if I caught a glimpse of the Shirley car. As I say, I am not sure." He further said that the Spalding car was 10 to 20 feet south of the culvert,

when plaintiff's car reached the ditch at the culvert.

The testimony of defendant tended to show that, on the day in question, he was 16 years of age and was operating a 1948 Plymouth south on Highway No. 17; that a school bus and the Spalding automobile were ahead of him and he ultimately passed both of them, passing the bus first and Spalding second; that the school bus was traveling at approximately 35 miles per hour when he passed it; and that when he pulled out and started to pass Spalding's automobile, he (defendant) was 150 feet beyond the crest of the second hump or hill. He said that, when he decided to pass Spalding, who was then two or three car lengths ahead, "I glanced back in the rear view mirror to see if anyone was behind me; seeing no one, I pulled out and passed the Spalding automobile; and when I was abreast of the Spalding automobile, I heard a crash off to the left of another automobile, the Shirley automobile, which had hit the ground opposite—or on the south side of the ditch (where the culvert is located)." Defendant said his inside rear view mirror, into which he looked was in proper adjustment at the time and would have enabled him to see a car behind him, if a car was behind him and in sight. He subsequently measured the width of the ditch at the end of the culvert and found it 23 feet wide at the top and 13 feet wide at the bottom. Plaintiff's automobile struck a telephone pole 51 feet south of the south bank of the ditch. Immediately after the accident, defendant saw tire marks on the left shoulder of the highway which marks began 100 yards north of the culvert. Defendant had been driving at 38 to 45 miles per hour and had accelerated to not to exceed 55 miles per hour to pass the Spalding automobile. He was already beside the Spalding automobile on the highway when he saw plaintiff's automobile hit the south bank of the ditch. At the time he looked in his rear view mirror, before turning out to pass the Spalding car, he did not know the plaintiff's car was behind him and had

no knowledge of its presence whatsoever on the highway. He heard no horn, signal or sound whatever from plaintiff's car until it struck the ground south of the ditch at the culvert. He had a radio in his car, but it was not on and he didn't remember whether the windows were up or down. Defendant did not remember whether or not he sounded the horn of his automobile before starting to go around the Spalding automobile. The automobile had no electric signaling devices and he did not give any hand signal of his intent to turn to the left. He said that in all probability the window was closed and that there was no way to make a signal, other than the movement of the car. He was abreast of or was in front of the Spalding car, when he heard a noise and saw plaintiff's automobile bounce on the south side of the gulley or ditch to his left.

Wayne Looten, a passenger in the front seat of defendant's car (to the right of defendant) first saw plaintiff's automobile as it went along the east shoulder of the highway. He did not know why he looked around. It might have been a horn or the noise of the car bouncing along the rocks. He did not remember having heard any horn, but when he first saw plaintiff's car it was off the road and he saw it as it went along the shoulder and over the culvert and into the field. If a horn had attracted his attention, he would have seen the car before it was down along the side of the road.

Carl Engelbrecht, age fifteen years at the time, was a passenger in the back seat of the Spalding automobile. He said that defendant's automobile was two or three car lengths behind the Spalding automobile shortly before the accident happened on the south slope of the second hill or hump. He qualified as a judge of speed and fixed the speed of the Spalding automobile at 40 to 50 miles per hour and said that defendant was driving at the same speed. He had turned half way around in the rear seat and was looking out of the rear window of the Spalding automobile. He testified: " * * * as we came over the hump, the second hump, going down the second hump as I looked back I saw Donny (defendant) glance up in his rear view mirror, I thought he was going to pass, and as he pulled out to pass, the Shirley car came over the hump on the left-hand side of the road. * * * The three cars were aside for just an *instance* and then the Shirley car was running along the shoulder and the Norfleet car and the Spalding car were on the highway yet and the Shirley car came to the culvert, why, it hit it and jumped, it skidded through a fence and stopped upright." He estimated the speed of plaintiff's car at between 70 and 90 miles per hour as he saw it come over the second hump and go down the left shoulder of the highway. While the witness had seen plaintiff's automobile turn off Highway No. 54 and enter Highway No. 17, behind the school bus, plaintiff's car was not in sight, and "must have been behind the second hump, behind the crest of the hump," when the defendant's automobile pulled out to the left side of the highway to pass Spalding at a point "a little over the top of the hill" (the second hump).

A highway patrolman, who arrived before the injured persons were all out of plaintiff's automobile, found plaintiff's 1949 Buick upright in a field some 15 yards southeast of the south bank of the ditch. He made an investigation and found tire marks on the left shoulder of the highway beginning 100 yards north of the south bank of the ditch. He followed the marks through the grass and on the shoulder to the ditch. There were no marks in the bottom of the ditch, but the earth and sod were torn up at the top of the ditch on the south bank, and plaintiff's automobile was a short distance south of the bank. The marks on the south bank of the ditch were in line with those he had followed down the left shoulder of the highway to the north bank of the ditch. The tire marks followed a general course parallel to the pavement, but veered away as they neared

the ditch. It was quite a large drainage ditch. The width of the blacktop for 300 feet north of the culvert was about 22 feet. The testimony of other witnesses need not be specifically reviewed.

■ At the close of all the evidence defendant moved for a directed verdict, but assigned no ground therefor and the motion was overruled. See Sections 509.-280 and 510.210 RSMo 1949, V.A.M.S. The cause was then submitted to the court on the pleadings and evidence adduced. No declarations of law were requested by either party and none were given. No request was made for any findings of fact or conclusions of law and none were made. See Sec. 510.310, subd. 2 RSMo 1949, V.A.M.S. The court made a general finding for defendant and as provided by the mentioned statute "all fact issues upon which no specific findings are made shall be deemed found in accordance with the result reached." While none of these matters are "necessary for purposes of review," we are not advised as to the trial court's findings on any of the principal controverted fact issues. We shall comply with the statute, Sec. 510.310, subd. 4 RSMo 1949, V.A.M.S., which provides: "The appellate court shall review the case upon both the law and the evidence as in suits of an equitable nature. The judgment shall not be set aside unless clearly erroneous, and due regard shall be given to the opportunity of the trial court to judge of the credibility of the witnesses." The burden rested upon plaintiff to prove the alleged negligence of defendant; and that such negligence was the proximate cause of the collision.

■ From a careful study of this entire record, weighing the evidence and giving due consideration to supporting and conflicting evidence, as well as giving due deference to the trial court's finding in so far as the credibility, weight and value of the oral testimony of the witnesses who appeared personally before the trial judge is concerned, we have reached the conclusion that plaintiff was guilty of contribu-

tory negligence which directly contributed to the collision and plaintiff's injuries, in that plaintiff's automobile was operated by her agent and servant (her son) at a high and dangerous rate of speed under the circumstances then and there existing, which negligence directly contributed to the receipt of her injuries and that there can be no recovery for primary negligence, even if it existed. In view of this conclusion it will be unnecessary to consider the first four points set forth in appellant's brief, where it is insisted that defendant was guilty of primary negligence in various respects.

In arriving at the conclusion that plaintiff was guilty of contributory negligence, we first consider the testimony of her son and principal witness on the issue of speed and circumstances. As stated, his testimony tended to show that he was operating the third automobile behind the school bus as he started down the long hill after leaving U. S. Highway 54. Each of the three automobiles passed the school bus and plaintiff's son admits that, when he passed the school bus shortly after entering Highway No. 17, he decided to pass the other two cars ahead of him; and that he did not thereafter return to the right-hand side of the highway, but continued for more than a half mile on the left side of the highway in an effort to overtake and pass these two automobiles. He increased the speed of the automobile to 70 miles per hour long before he reached and undertook to pass the defendant's automobile. Before he reached and undertook to pass defendant's automobile, Lyndal had passed through the two dips where the view ahead was obstructed and he had crossed over both of the crests. When the movement of defendant's automobile caused him to leave the highway he drove his automobile to the left and down the shoulder, jumped the ditch and went some 51 feet beyond the south bank of the ditch and collided with the telephone pole with such force as to result in the injuries complained of.

There are a number of factors in this case, in addition to the direct testimony of witness Engelbrecht, which to our mind indicates that the speed of plaintiff's automobile was materially in excess of 70 miles per hour at the time the automobile was turned to the left shoulder of the highway. Some have been mentioned. It will be remembered that Lyndal passed the school bus shortly after leaving Highway No. 54 and that when he passed the school bus he had then definitely determined to overtake and pass both of the automobiles still ahead of him. At that time he was still moving down the long hill, down a 7 percent grade. He increased the speed of the car in an effort to overtake and pass the automobiles ahead of him. He said he was 10 feet behind defendant's automobile when he was only 50 feet beyond the crest of the second hump; that in 50 feet he had decreased the distance between his automobile and defendant's from 25 feet to 10 feet; that, when he decided to turn to the left shoulder, he applied his brakes for only about 5 feet and then released them. Although the brakes were in good working order, (he was familiar with the fact) they were not further applied during the next 375 feet or so. We think the inference can be drawn that the speed of the automobile was such that the driver did not feel it safe to apply the brakes further on the highway or at any time during the trip down the shoulder, over the ditch and to the point of collision and injury. The witness in effect concedes that the speed of the automobile was such it was unsafe to apply the brakes on the shoulder as he testified that the tail end of the automobile would come around. Further, the evidence shows that, although the tire marks were clearly apparent on the left shoulder for more than 300 feet before the ditch was reached, there were no tire marks in the bottom of the ditch, and that the tire marks on the south bank and the disturbance of the sod at the top of the south bank of the ditch indicated

that the speed of the automobile was such that it was able to jump a 23 foot ditch, land upright on its wheels and continue upright for 50 feet further and then collide with a telephone pole, a bank and a fence with such force as to injure the plaintiff in the manner set forth in her testimony. We are also of the opinion that plaintiff's automobile was much further behind defendant's than Lyndal's testimony would indicate and that it was in fact north of the second hill top or crest when defendant turned to the left on the south slope of the second crest. Further, at 70 miles per hour, an automobile travels over 100 feet per second and at 50 miles per hour over 73 feet per second and it is apparent that, if plaintiff's automobile was within 10 feet of defendant's, when defendant's swung to its left into the pathway of plaintiff's automobile, a collision would have happened within the reaction time of the respective parties and before any action could be taken. We are also of the opinion that driving over the second crest at a speed far in excess of 70 miles per hour on the left-hand side of the highway was a material factor in the difficulty. In view of the facts hereinbefore set out, as well as that reviewed, on which the trial court found for defendant, we think the evidence shows excessive speed under the circumstances as a proximate cause of the collision and injuries.

Appellant insists that speed was not a proximate cause of the casualty; that speed only furnished the condition or gave rise to the occasion by which plaintiff's injury was made possible; and that it could not reasonably have been foreseen that injury would occur from the speed and circumstances shown. Branstetter v. Gerdeman, 364 Mo. 1230, 274 S.W.2d 240, 246; Smith v. Mabrey, 348 Mo. 644, 154 S.W.2d 770, 772; Borack v. Mosler Safe Co., 288 Mo. 83, 91, 231 S.W. 623; Wheeler v. Breeding, Mo.App., 109 S.W.2d 1237, 1242. We think no injury would have occurred except for the operation of plaintiff's automobile

at an excessive and dangerous speed under the circumstances shown. The only remaining issue is whether defendant was guilty of humanitarian negligence.

Appellant further contends that, "even though Lyndal Shirley was driving the automobile in which plaintiff was riding at a speed of seventy miles per hour, or even faster, at the time of the casualty * * * yet plaintiff is entitled to recover in this cause under the humanitarian doctrine, for the reasons that as and when defendant determined to and began to turn his automobile from a direct course on his right of the center of the highway in order to overtake and pass the automobile driven by Kelan Spalding, traveling ahead of defendant, plaintiff came into a position of imminent peril of collision with the automobile driven by defendant, at which moment defendant, in the exercise of the highest degree of care and with the means at hand, and with complete safety to himself and to all other persons, could have and should have seen and observed the automobile in which plaintiff was riding and could have and should have prevented or averted the casualty shown in the record by continuing to drive to his, defendant's, right of the center of the highway or by turning his said automobile to his right or by slowing and turning his said automobile to his right, but defendant negligently and carelessly failed to * * *" (do so).

■ On plaintiff's evidence plaintiff did not come into imminent peril, until her automobile was within 10 feet of defendant's automobile. She was in no peril, until defendant turned his automobile to the left side of the highway to pass the Spalding automobile. On plaintiff's evidence, it was the affirmative action of defendant, when plaintiff was within 10 feet of defendant, that created the peril and it was one of the acts which plaintiff charges as the primary negligence of defendant. The humanitarian doctrine may be applied only where the negligence relied on has fol-

lowed after the imminent peril arose and not where such negligence occurred before the imminent peril arose. Blaser v. Coleman, 358 Mo. 157, 213 S.W.2d 420, 422(7); McClanahan v. St. Louis Public Service Co., 363 Mo. 500, 251 S.W.2d 704, 706.

■■ On plaintiff's evidence there was no action the defendant could have taken within reaction time to have cleared the path for plaintiff's automobile. By the time that defendant could have acted it would have been too late to turn back or take other action, and after plaintiff's driver had acted, it was too late for defendant to act. It was plaintiff's duty to establish by substantial evidence of probative value the length of time that she was in a position of peril and that defendant had time to act. East v. McMenamy, Mo.Sup., 266 S.W.2d 728, 731(4–5). Further, there is no evidence as to where defendant's automobile was located on the highway with reference to the Spalding automobile, when plaintiff came into peril, or as to where defendant's automobile was or would have been with reference to the Spalding automobile at the end of defendant's reaction time after plaintiff came into imminent peril. It is apparent that plaintiff's peril arose from the movement of plaintiff's and defendant's automobiles and that, after it arose, the time was too short for defendant to do anything about it. Our finding from the evidence is that, after plaintiff came into imminent peril, defendant could have taken no action to avoid the peril and the humanitarian doctrine has no application under the facts of this case. Smith v. Siedhoff, Mo.Sup., 209 S.W.2d 233, 237(5–8); Blaser v. Coleman, supra; McClanahan v. St. Louis Public Service Co., supra; Fisher v. Gunn, Mo.Sup., 270 S.W.2d 869, 872, 874; Kelly v. Rieth, Mo.App., 168 S.W.2d 115, 119(2); Glenn v. Offutt, Mo. App., 309 S.W.2d 366, 370.

The judgment is affirmed.

All concur.