William W. DILLON and Ella Mae Dillon,
Plaintiffs-Respondents,

v.

James C. HOGUE, Defendant-Appellant.

No. 8261.

Springfield Court of Appeals.
Missouri.

Aug. 26, 1964.

Ward & Reeves, Caruthersville, for defendant-appellant.

Kenneth L. Dement, Sikeston, for plaintiffs-respondents.

STONE, Judge.

In this jury-tried case, defendant James C. Hogue appeals from the judgment for $10,000 obtained by plaintiffs, William W. Dillon and Ella Mae Dillon, on account of the alleged wrongful death of Michael Wayne Dillon (hereinafter called Mike), their five-year old son, by reason of injuries sustained when he was struck about 4:20 P.M. on Thursday, July 19, 1962, by a 1962 Ford Fairlane sedan then being driven by defendant in a southerly direction on Missouri State Highway 105 at a point one and one-half miles north of East Prairie, Mississippi County, Missouri.

In their petition, plaintiffs charged defendant with primary negligence in five particulars and with humanitarian negligence; but, by their sole verdict-directing instruction 1, plaintiffs submitted in the disjunctive only humanitarian negligence in (1) failing to stop, (2) failing to "sufficiently" slacken speed, and (3) failing to swerve to the right or to the left, thereby abandoning all other pleaded grounds of negligence. Welch v. McNeely, Mo., 269 S.W.2d 871, 875(1), and cases there cited. On this appeal, defendant, who offered no evidence but stood on his motion for a directed verdict at the close of plaintiffs' evidence, insists that plaintiffs did not make a submissible case on humanitarian negligence and that the trial court erred in the giving of instructions and in the admission of evidence.

◼ Our factual review is with appropriate recognition of the basic rule that, in determining whether a submissible case was made, we must consider the evidence in the light most favorable to plaintiffs and must accord to them the benefit of all supporting inferences fairly and reasonably deducible from the evidence [DeLay v. Ward, 364

Mo. 431, 439, 262 S.W.2d 628, 633(3); Ornder v. Childers, Mo., 327 S.W.2d 913, 915 (1); Appelhans v. Goldman, Mo., 349 S.W. 2d 204, 208(8)], tempered only by the sensible limitation that this rule calls for consideration of all the facts shown by plaintiffs and not merely a part of them isolated from the remainder, and that the rule does not require courts to supply missing evidence, or to disregard the dictates of common reason and accept as true that which, on the whole record, obviously is not true, or to give plaintiffs the benefit of inferences other than reasonable ones. Kirks v. Waller, Mo., 341 S.W.2d 860, 863(3); Holland v. Lester, Mo.App., 363 S.W.2d 75, 80; Reames v. St. Louis-San Francisco Ry. Co., Mo.App., 359 S.W.2d 230, 235(2).

At and near the point of accident, Highway 105 runs generally north-and-south and has a paved roadway, nineteen feet in width, with an interrupted white center line. On the east side of the center line, there is a nine-foot concrete lane and, on the west side, a ten-foot blacktop lane. The west shoulder of the highway is six to seven feet in width, and the west ditch, described as a "V-type ditch, a grader-type ditch," averages ten feet in width and is twelve to eighteen inches in depth. The grass and weeds along the shoulder and in the ditch are kept mowed. There are four houses on the west side of Highway 105 near the point of accident. A southbound motorist, such as defendant, passes in this sequence the Burchett home, the Blumenberg home, the Dillon home where plaintiffs and their family reside, and the Presson home.

On the afternoon of the fatal accident, Mike Dillon, then five, and Gene Frye, then six, were playing in the front yard of the Dillon home while Mike's brother, Ricky Webb Dillon, then eight, at the moment was sitting on the front steps. Gene threw his toy pistol across the highway, and Mike was struck by defendant's southbound automobile as he moved across the paved roadway, presumably to retrieve the toy. The record provides two accounts of Mike's action im-

mediately prior to the accident, i. e., one by Ricky, nine at the time of trial, and the other by defendant's testimony read in evidence from his pretrial deposition. We turn first to defendant's testimony which, as his counsel state (and we agree), is "more favorable to the plaintiffs" than is Ricky's testimony.

Defendant, thirty-five years of age, had been employed by the Brown Shoe Company at Charleston, Missouri, for thirteen years and had made the round trip between his home in East Prairie and Charleston five days each week during that period of employment. On the day of accident, the weather was good and the pavement was dry. With his wife and two other passengers, defendant was en route from Charleston to East Prairie in his 1962 Ford sedan, which he had purchased new some two or three months previously. The tires were "new" and the hydraulic brakes were in good working condition.

Defendant's estimate (and the only estimate) of the speed of his automobile, as he approached the scene of accident, was forty to forty-five miles per hour. When he was "pretty well in front of" or "about in front of" the Blumenberg home (the first house north of the Dillon home), defendant first saw Mike "somewhere in front of" the Dillon home, in the west ditch or "coming out of the edge of the ditch," and running toward the highway. In his words, defendant immediately "got on my brakes and blowed [sic] my horn. * * * He [Mike] almost came to a stop, or appeared that he did, and I wouldn't say that he did, but what I mean, the best I remember he turned towards me." But Mike continued onto the pavement and, when he was about "three-fourths of the way across" the west or southbound lane (and thus within two or three feet of the center of the highway), he was struck by defendant's automobile.

Trooper Montgomery of the Missouri State Highway Patrol, who investigated this accident, found parallel "tire marks" or "skidmarks" approximately 114 feet in length, which had been left by defendant's automobile "as far as I [Montgomery] could tell." Both parallel marks began in the west or southbound lane at a point about even with the property line between the Blumenberg and Dillon homes and ran in a southerly direction, curving gradually to the west with the right-hand mark running onto the west shoulder. Plaintiffs' witness Lucas, a registered land surveyor, testified that the distance "from about the *middle* of the Blumenberg home to the *middle* of the Dillon home" was 170 feet, "one foot more or less," and a large plat *drawn to scale* by Lucas and received in evidence shows that it is approximately 124 feet from the *south end* of the Blumenberg home to the *north end* of the Dillon home. (All emphasis herein is ours.)

Before ruling defendant's points, we refer briefly to the factual account offered by Ricky, Mike's brother. His father, plaintiff William, had stated in a pretrial deposition that, although Ricky had seen the accident, "he can't give me any picture, only but that boy [Mike] was hit and he [Ricky] run to the boy when he fell"—"you can talk to him and he will say he seen this, and then you will say, did it happen like this, and he will say yes." But by trial time, Ricky apparently was regarded as having ripened into "a testimonial plum" to be "shaken down" before the jury. Hildreth v. Key, Mo.App., 341 S.W.2d 601, 610. Upon trial, defendant's counsel objected to a substantial portion of Ricky's testimony on the grounds of "estoppel" and "surprise" by reason of plaintiff William's statements in his pretrial deposition; and, on this appeal, error is assigned in the overruling of that objection. There having been no objection to the competency of Ricky as a witness [V.A.M.S. § 491.060; Hildreth v. Key, supra, 341 S.W.2d loc.cit. 608–612], no doubt the objection to his testimony was ruled properly. But it is unnecessary for us to assume the difficult and unrewarding burden of attempting to piece out from Ricky's childish responses a consistent, coherent, comprehensive account of Mike's conduct

and movements, since *plaintiff's* attorney (although insisting that Ricky properly was permitted to testify) asserts that he "presented a prima facie case of humanitarian negligence without the aid of Ricky Dillon's testimony, which was merely cumulative." However, it may not be inappropriate to observe in passing that Ricky did not see defendant's automobile until he "heard the wheels of the wreck [sic] squeaking" and "turned around," and that it would be utterly impossible to determine from his testimony either the location or the speed of defendant's automobile when Mike was at any given point. Cf. Davis v. St. Louis Public Service Co., Mo., 316 S.W.2d 494, 498(9).

■ Our initial concern is as to submissibility; and, since *plaintiff's* verdict-directing instruction 1 submitted *disjunctively* humanitarian negligence in three particulars, we must determine whether a prima facie case was made on each submitted particular. We consider first defendant's alleged negligence in *failing to stop*. Of course, the humanitarian doctrine imposed upon defendant no duty to act until a situation of imminent peril arose [Wilson v. Toliver, Mo., 305 S.W.2d 423, 429(8); Schmidt v. Allen, Mo., 303 S.W.2d 652, 657(6); Yeaman v. Storms, 358 Mo. 774, 778, 217 S.W. 2d 495, 498(1)], and the precise place where, and time when, Mike came into a position of imminent peril were for the jury to determine. Bunch v. Mueller, 365 Mo. 494, 499, 284 S.W.2d 440, 443(6); Welch v. McNeely, supra, 269 S.W.2d loc.cit. 876(10); Stith v. St. Louis Public Service Co., 363 Mo. 442, 450, 251 S.W.2d 693, 698(7), 34 A.L.R.2d 972. But the jury reasonably could have found that Mike was in imminent peril, when defendant first sighted him (Mike) in the west ditch and running toward the highway. Triller v. Hellwege, Mo., 374 S.W.2d 104, 107(4). In fact, the

mathematical calculations in *defendant's* brief are made on that assumption. Thus, defendant's counsel say that Mike ran "not more than seventeen to twenty-two feet from a position of safety to impact," the longer distance of twenty-two feet including, with a show of generosity toward adversary counsel, (a) five feet as half the width of the west ditch, (b) seven feet as the width of the west shoulder, and (c) ten feet as the width of the west or southbound traffic lane.

But we need not detail the computations in defendant's brief, for they are presented not only (1) on the assumption of counsel, which (in view of their trial theory) we do not accept, that Mike ran at a speed of ten miles per hour, but also (2) on the egregiously-erroneous premise that, in the language of counsel, "there is no evidence in this record as to the distance between them [Mike and defendant's automobile] when the peril did arise." As for the speed at which Mike ran, defendant's counsel point to plaintiff William's statement that Mike "*could* run like a rabbit" and *here* rely upon Vietmeier v. Voss, Mo., 246 S.W.2d 785, 788, where "[t]he only testimony" was that the minor plaintiff "ran fast and did not slacken his speed until he ran into and struck the automobile" and the court's holding was that "[t]he jury could reasonably infer that even a five year old boy could run the short distance this plaintiff ran at a speed of *ten* miles per hour for a man will walk at from four to five miles per hour." But, in the judicial wonderland of the humanitarian doctrine where courts and counsel alike delight in casting liability upon *precise* mathematical calculations employing *imprecise* estimates or assumptions of speeds and distances, different running speeds for young children have been assumed or found in other cases;[1] in the instant case there was no testimony that, im-

---

1. E.g., in Bunch v. Mueller, 365 Mo. 494, 501, 284 S.W.2d 440, 445, the jury could have determined "as a matter of common knowledge" that a girl 10 ran "at around 5 or 6 miles per hour"; in Edwards v. Dixon, Mo.App., 298 S.W.2d 466, 469(4), the jury could have found "[n]ot only from the evidence, but as a matter of common knowledge" that a boy 9 ran "around 5 or 6 m.p.h."; and, in

mediately prior to the accident, Mike *did* run "like a rabbit"; and defendant's counsel may not here change or depart from their trial theory, as evidenced by their specific request that the court "take judicial notice of the fact * * * that a child of approximately five or six years of age can run approximately *five or six* miles per hour." Olsten v. Susman, Mo., 362 S.W. 2d 612, 614(3); Greathouse v. Wolff, Mo. App., 360 S.W.2d 297, 301(2); Hill v. Seaboard Fire & Marine Ins. Co., Mo.App., 374 S.W.2d 606, 610(6).

More importantly, defendant's counsel overlook their client's testimony that he was "pretty well in front of" or "about in front of" the Blumenberg home when he first sighted Mike "somewhere in front of" the Dillon home, in the west ditch or "coming out of the edge of the ditch," and running toward the highway. From this testimony, the jury reasonably could have inferred and found that defendant actually saw Mike when the intervening distance was in the range between 170 feet (the distance between the middle of the Blumenberg home and the middle of the Dillon home) and 124 feet (the distance between the *south* end of the Blumenberg home and the *north* end of the Dillon home); and, as we have said, the jury also could have found that Mike was then in imminent peril. If defendant, after sighting Mike in a position of imminent peril, had the then ability with the means at hand to have stopped short of the point of impact without injury to himself or others but failed to do so, he properly might have been found guilty of humanitarian negligence. Banks v. Morris & Co., 302 Mo. 254, 267, 257 S.W. 482, 484(2). So, in considering whether a submissible case was made on humanitarian negligence in failing to stop, our simplified inquiry is whether defendant could have stopped within the available intervening distance of 170 to 124 feet after he saw Mike. If he could, it becomes unnecessary for us to assume or find,

and thus wholly immaterial, precisely how far or precisely how fast Mike moved after he was sighted by defendant.

Two witnesses testified with respect to stopping distances, namely, witness Simmons, Sheriff of Mississippi County, Missouri, and Trooper Montgomery. *Simmons* testified concerning a series of three experiments in stopping a 1962 Ford Fairlane running *45* miles per hour, which he conducted on Highway 105 in front of the Blumenberg and Dillon homes on the afternoon before the trial. Plaintiffs' counsel, riding in the automobile, instructed Simmons that, when he heard counsel "slap on the dash," he (Simmons) was to apply the brakes. *Simmons also had been told in advance the approximate point at which he was "going to have to put those brakes on."* According to Simmons, the results of the three experiments were as follows. In the *first* experiment, the total stopping distance was "approximately 80 feet" which included "skidmarks" or braking distance of 66 feet and thus left only 14 feet as the distance traveled during reaction time. In the *second* experiment, the total stopping distance was 72 or 73 feet; and, although the length of the "skidmarks" or braking distance was not stated, Simmons gave the distance traveled during reaction time as "about 10 or 12—about 10 feet." In the *third* experiment, the total stopping distance was 62 feet which included "skidmarks" or braking distance of "approximately 58 feet" and thus left only 4 feet as the distance traveled during reaction time, although Simmons on cross-examination thought that this distance was "approximately 9 feet."

Defendant asserts that Simmons' testimony as to stopping distances should be rejected as manifestly incredible. Although "it is a matter of common knowledge that the actual *braking distance* alone of an automobile moving at a speed of *40* miles per hour would exceed 60 feet by a substantial

Triller v. Hellwege, Mo., 374 S.W.2d 104, 106, plaintiffs' "traffic engineer" testified that the "average running speed of an

eight-year-old girl is approximately 6 to 8 m.p.h."

amount" [Stonefield v. Flynn, Mo.App., 347 S.W.2d 472, 478], we need not determine whether Simmons' testimony concerning *braking distances* of 66 to 58 feet at *45* miles per hour should be rejected as manifestly incredible.[2] His *total stopping distances* of 80 to 62 feet at *45* miles per hour[3] included and were predicated upon *distances of 14 to 4 feet traveled during reaction time.* We know judicially that an automobile traveling 45 miles per hour moves 66 feet per second [cf. Danner v. Weinreich, Mo., 323 S.W.2d 746, 752(6)] and, during the reaction time of three-fourths second frequently used by courts and counsel in their computations [e. g., Vietmeier v. Voss, supra, 246 S.W.2d loc. cit. 788(5); Peterson v. Tiona, Mo., 292 S.W.2d 581, 583], moves 49½ feet. Of course, we also know that all individuals do not have the same reaction time, but three-fourths second appears to be a relatively fast time.[4] The distances traveled by Simmons during his reaction time were (so he said) only 14 to 4 feet which, at 45 miles per hour, would be covered in *.21 second to .06 second.* Obviously application of brakes within any such infinitesimal period would reflect quicker reaction than the lightning draw of the fastest gun in the legendary West.

Although courts do not have judicial knowledge as to the *exact distance* within which an automobile can or cannot be stopped under given circumstances, they do take judicial notice of *limits* within which an automobile traveling at a stated rate of speed *can be stopped* [Perry v. Dever, Mo., 303 S.W.2d 1, 7(14); Peterson v. Tiona, supra, 292 S.W.2d loc. cit. 583(3); Mallow v. Tucker, Mo., 281 S.W.2d 848, 851(4); Harrellson v. Barks, Mo.App., 326 S.W.2d 351, 358(5)] *or cannot be stopped.* Stonefield v. Flynn, supra, 347 S.W.2d loc. cit. 477; Danner v. Weinreich, Mo., 323 S.W.2d 746, 752. And they are not compelled to accept blindly testimony concerning stopping distances which is contrary to common knowledge and experience and is manifestly incredible. Stonefield v. Flynn, supra, 347 S.W.2d loc. cit. 477–478(5, 8); Kelly v. Terminal R. R. Ass'n. of St. Louis, Mo., 315 S.W.2d 699, 702–703. We would not be misunderstood as holding that testimony as to stopping distances must be confined to the distances set forth in the Missouri Drivers Guide. But there are *limits* beyond which litigants and their witnesses should not be heard to impose upon the credulity of courts or juries; and it is our considered judgment that Simmons' testimony as to stopping distances clearly falls without those *limits,* is manifestly incredible, and should not be considered in determining submissibility.[5]

2. The *then current* issue of the Missouri Drivers Guide showed at *40* mph a *braking distance* of 82 feet (no figure was shown for *45* mph), and the latest issue of the Guide (which accords appropriate recognition to differences in "brake gripping efficiency") shows at *45* mph a *braking distance* of 90 feet with "excellent" brake gripping efficiency, of 104 feet with "good" brake gripping efficiency, and of 135 feet with "fair" brake gripping efficiency.

3. The latest issue of the Missouri Drivers Guide shows at *45* mph *total stopping distances* of 139½ feet with "excellent" brake gripping efficiency, of 153½ feet with "good" brake gripping efficiency, and of 184½ feet with "fair" brake gripping efficiency.

4. In the latest issue of the Missouri Drivers Guide, the tables of "Speed and Stopping Distances" include, for each speed shown, the distances traveled not only during a reaction time of *three-fourths second* but also during a reaction time of *one second*; and, in the footnotes to the same tables, it is said that "tests have shown the time required for the average driver to put his foot on the brake pedal, after seeing approaching danger, *ranges from three-quarters of a second to as much as one and one-half seconds.*"

5. In Faught v. Washam, Mo., 329 S.W.2d 588, 598, the sole case cited by instant plaintiffs on this point, the *only* complaint (about the experimental evidence) presented or ruled was, in substance, that the experiments had not been conducted under visibility and roadway conditions substantially similar to those prevailing at the time of accident. That is not the complaint here.

■ However, plaintiffs say that, if Simmons' testimony be disregarded, they nevertheless made a submissible case of humanitarian negligence. This turns us to the testimony of Trooper *Montgomery*. Insofar as submissibility of defendant's alleged failure to stop is concerned, the salient portion of Montgomery's testimony, *as developed on cross-examination by defendant's counsel,* is that "the overall stopping distance at *40* miles per hour" is "approximately 126 feet," comprising (a) 44 feet as the distance traveled during an assumed reaction time of three-fourths second and (b) "approximately 82 feet" as the braking distance.[6] Without further belaboring the facts, suffice it to express our opinion at this point that, on Montgomery's testimony, the jury reasonably could have found that defendant, at his lower estimated speed of 40 miles per hour, could have stopped within the distance then available to him (i. e., within the range from 170 to 124 feet) when he first sighted Mike in a position of imminent peril, and that, therefore, plaintiffs made a submissible case on defendant's alleged *failure to stop.*

In the circumstances of this case, it logically and necessarily follows that if, as we have held, the jury reasonably might have found that defendant in the exercise of the highest degree of care could have stopped his automobile before striking Mike, the jury likewise might have found that defendant could have *slackened its speed sufficiently* to have enabled Mike to have cleared its path safely. Sperry v. Tracy Dodge-Plymouth Co., Mo., 344 S.W.2d 108, 112; Peterson v. Tiona, supra, 292 S.W.2d loc. cit. 584.

■ With respect to submissibility for *failure to swerve to the left or to the right,* defendant's argument here is that he could not have swerved to the *left* "because he

was meeting a truck" or to the *right* because "that was the direction from which Mike was running, there was another child near the ditch, and * * * he would have struck Mike sooner." But defendant himself testified that he had passed the northbound truck when he was "about in front of" the Blumenberg home (i. e., within the range of 170 to 124 feet north of the point of accident) and that there was no northbound vehicle following the truck, so approaching traffic did not prevent or interfere with his swerving to the *left.* It is fairly inferable from the record that Gene Frye, the boy with whom Mike had been playing, remained on the *west* side of the *west* ditch so, if (as defendant stated) Mike was, at the moment of impact, about "three-fourths of the way across" the west or southbound traffic lane, the west seven feet of that traffic lane and the west shoulder, some six or seven feet in width, were available for swerving to the *right.* Alleged humanitarian negligence in failing to swerve in either direction was submissible.

Defendant contends that plaintiffs' instruction 2 was erroneous as improperly injecting defendant's primary negligence into the humanitarian submission. This instruction reads as follows: "[1] The court instructs the jury [a] that under the law of this state, the operator of a motor vehicle on public streets, roads, or highways of this state is required to exercise the highest degree of care, and [b] by the term 'highest degree of care' as used herein is meant that degree of care that a very careful and prudent person would ordinarily exercise under the same circumstances, and [c] that a failure to exercise such care would constitute negligence as that term is used in these instructions, and [2] in that regard the court further instructs the jury that defendant also must be charged with the knowledge that children do not have the

---

6. Montgomery used and followed the tables of "Speed and Stopping Distances" in the *then current* issue of the Missouri Drivers Guide. The latest issue of the Guide shows at 40 mph a "total stopping dis-

tance" of 115 feet with "excellent" brake gripping efficiency, of 128 feet with "good" brake gripping efficiency, and of 151 feet with "fair" brake gripping efficiency.

foresight or exercise the care for their own safety that people of mature years exercise, and that their actions are more or less unpredictable, and that thoughtless and impulsive acts of children are to be expected and guarded against." (We have inserted the bracketed numbers and letters to facilitate reference to the two sections of this instruction and to different clauses of section 1 thereof.)

■■ It is firmly established that primary or antecedent negligence cannot be considered in determining whether a defendant has been guilty of humanitarian negligence, and that, therefore, primary negligence has no place in a submission solely under the humanitarian doctrine. Downing v. Dixon, Mo.App., 314 S.W.2d 927, 930 (2), and cases cited in footnote 2. "In so far as the jury are authorized (in submitting the issues of a humanitarian case) to consider conduct antecedent to the situation invoking the humanitarian rule in determining whether the defendant thereafter exercised due care, just so far is the humanitarian rule nullified and its purpose defeated" [Teague v. Plaza Express Co., 354 Mo. 582, 591, 190 S.W.2d 254, 258(6)], for it is only when imminent peril (within the meaning of the humanitarian doctrine) arises that such doctrine, *blotting out primary or antecedent negligence,* seizes upon the then existing situation and imposes a duty *thereafter* to exercise proper care to avoid infliction of the threatened injury.[7] Therefore, it has long been the rule that plaintiff's instructions in a humanitarian case "must be so worded as to exclude a recovery based on primary negligence." White v. Kansas City Public Service Co., 347 Mo. 895, 898, 149 S.W.2d 375, 377(1); McDonough v. St. Louis Public Service Co., Mo., 350 S.W.2d 739, 746.

Language, such as that in section 1 of instant instruction 2, defines in general terms the duty of a driver under the law of primary negligence as well as under the humanitarian doctrine [Thayer v. Sommer, Mo., 356 S.W.2d 72, 76; Reiling v. Russell, 348 Mo. 279, 284, 153 S.W.2d 6, 9; Wright v. Hummel, Mo.App., 164 S.W.2d 640, 644]; and, in a number of Missouri cases, instructions containing such language have been held prejudicially erroneous as injecting primary negligence into a humanitarian submission.[8]

■ Section 2 of instruction 2 charged defendant "with the knowledge that children do not have the foresight or exercise the care" of adults, "that their actions are more or less unpredictable, and that thoughtless and impulsive acts of children are to be expected and guarded against." The tender age of a pedestrian may be one of many factors considered by the jury in determining, as is their function [Welch v. McNeely, supra, 269 S.W.2d loc. cit. 876 (10)], the precise place where, and time when, such pedestrian comes into a position of imminent peril under the humanitarian doctrine. But, even if that were a proper subject of instruction (a question which we need not explore), the abstract language of section 2 was not so limited and conveyed no such message. Generally speaking, to anticipate and guard against the thoughtless and impulsive acts of children is associated with the duty to maintain a vigilant lookout [Hildreth v. Key, supra, 341 S.W.2d loc. cit. 607], the violation of which creates a cause of action for primary, not humanitarian, negligence. Cunningham v. Thompson, Mo., 277 S.W.2d 602, 609(8); Murphy v. St. Louis Public Service Co., 362 Mo. 772, 777, 244 S.W.2d 31, 34(4); Mayfield v. Kansas City Southern Ry. Co.,

7. Davis v. Quality Oil Co., Mo., 353 S.W. 2d 670, 673(2, 3); Ornder v. Childers, Mo., 327 S.W.2d 913, 916(3); Yarrington v. Lininger, Mo., 327 S.W.2d 104, 108(2–4); Downing v. Dixon, Mo.App., 314 S.W.2d 927, 930(3); Batson v. Ormsbee, Mo.App., 304 S.W.2d 680, 683 (4), and cases there cited.

8. Thayer v. Sommer, Mo., 356 S.W.2d 72, 76(3); Downing v. Dixon, Mo., 313 S.W.2d 644, 648–649(1); Barnes v. Jones, Mo., 306 S.W.2d 512, 515–516(2); Reiling v. Russell, 348 Mo. 279, 283, 153 S.W.2d 6, 8–9(2); Wright v. Hummel, Mo.App., 164 S.W.2d 640, 643–644(2).

337 Mo. 79, 93, 85 S.W.2d 116, 124(17). And the abstract language of section 2 covered and included the precautionary vigilance or alertness required of a motorist *prior to an emergent situation of imminent peril,* for the want of which a cause of action likewise is raised by the law of primary negligence, not by the humanitarian doctrine. Anderson v. Prugh, 364 Mo. 557, 566–567, 264 S.W.2d 358, 365(12).

In undertaking to support instruction 2, plaintiffs emphasize that it did not direct a verdict and they point out certain language, to wit, (1) *"as used herein"* in clause (b) of section 1, (2) *"as that term* [negligence] *is used in these instructions"* in clause (c) of section 1, and (3) *"in that regard"* introducing section 2, as affording (so they assert) such "clear reference to" their verdict-directing instruction 1 and defendant's instruction 6 (which conversed one essential element of plaintiffs' humanitarian submission) "that defendant's duty stated in instruction 2 was limited to the time *after* Michael Dillon was in a position of imminent peril." But this argument is not satisfying or convincing. For, in most of the above-cited cases,[9] the disapproved instructions were not verdict-directing but were "separate in form, as ours is" [Downing v. Dixon, Mo., 313 S.W.2d 644, 649]; and, in several instances,[10] language such as that relied upon by instant plaintiffs did not save similar instructions from judicial condemnation.

9. Downing v. Dixon, supra, 313 S.W.2d loc. cit. 648–649; Barnes v. Jones, supra, 306 S.W.2d loc. cit. 515–516; Wright v. Hummel, supra, 164 S.W.2d loc. cit. 643; Sperry v. Tracy Dodge-Plymouth Co., Mo., 344 S.W.2d 108, 114. See Thayer v. Sommer, supra, 356 S.W.2d loc. cit. 76.

10. In Sperry v. Tracy Dodge-Plymouth Co., supra, 344 S.W.2d loc. cit. 114, the instruction not only included such language as "the terms 'negligence' or 'negligently' as used in these instructions and applied to defendant" and "in this connection" but also referred to "other persons upon such streets who may be im-

On this point, plaintiffs cite four cases. The first, Kirkham v. Jenkins Music Co., 340 Mo. 911, 104 S.W.2d 234, is cited in support of counsel's statement that "the statutory duty to exercise the highest degree of care is applicable to a humanitarian negligence case involving an automobile"; but, as we have noted, *no duty* arise* under the humanitarian doctrine until a situation of imminent peril comes into being. In State ex rel. Berberich v. Haid, 333 Mo. 1224, 64 S.W.2d 667, 669, an instruction simply defining "the highest degree of care" was given and (as pointed out in Downing v. Dixon, supra, 313 S.W.2d loc. cit. 649) on appeal was found not prejudicially erroneous as against the complaint "that it was merely an abstract statement of law." The objection that the instruction injected primary negligence into a humanitarian submission was neither raised nor ruled. On its face, Fair v. Thompson, 240 Mo. App. 664, 212 S.W.2d 923, 930 (13, 14), would seem to afford support for instant plaintiffs' instruction 2. However, both Fair v. Thompson, supra, and Hoelzel v. Chicago, R. I. & P. Ry. Co., 337 Mo. 61, 85 S.W.2d 126, 130 (cited in the Fair case as supporting the instruction there attacked), were among the cases listed in Anderson v. Prugh, supra, 364 Mo. loc. cit. 564–565, 264 S.W.2d loc. cit. 363, as not in accord with other cases more recently decided by the Supreme Court.

The fourth case cited by plaintiffs is Wright v. Osborn, 356 Mo. 382, 388–389,

periled" and to defendants' duty "to discover persons so imperiled" and closed with "negligence as that term is used herein and applied to the defendants"; in Downing v. Dixon, supra, 313 S.W.2d loc. cit. 648, the instruction included "it is in that sense that the terms 'highest degree of care' and 'negligence' are used in these instructions"; and in Wright v. Hummel, supra, 164 S.W.2d loc. cit. 643, the instruction included "as you may find the same [highest degree of care] used in the instructions of the Court" and closed with "as that term [negligence] is used in these instructions."

201 S.W.2d 935, 939–940, where the instruction under attack "was only a definitive instruction" which stated the meaning of "the highest degree of care" and (as the court specifically noted) did not even include the further statement that "'the failure to exercise the highest degree of care would constitute negligence.'" The court understandably did not believe that this instruction "opened to the jury the door to the consideration of primary negligence"; but, if it did, defendants' limiting instruction, which told the jury "[i]n no uncertain terms * * * that regardless of any other fact or issue Osborn was under no duty whatever to the boy until peril arose and Osborn could have known of the peril," effectively foreclosed consideration by the jury of any possible theory of primary negligence. Instant plaintiffs' instruction 2 was by no means so innocuous for, although "highest degree of care" was defined in clause (b) of section 1, this definition was *preceded* and *followed* by declarations in clauses (a) and (c) of section 1 which stated "the duty, generally, applicable to any ground of negligence, of persons operating automobiles on public highways" [Reiling v. Russell, supra, 348 Mo. loc. cit. 284, 153 S.W.2d loc. cit. 9; Downing v. Dixon, supra, 313 S.W.2d loc. cit. 648], and section 2 then directed attention to defendant's duty to anticipate and guard against thoughtless and impulsive acts of children. All of this was without limitation to the period after Mike came into imminent peril and without any clear reference to or any explained connection with defendant's duties as set forth in plaintiffs' verdict-directing instruction 1. Furthermore, plaintiffs had pleaded defendant's alleged *primary* negligence in failing to keep a proper lookout, and evidence in support of that assignment had been offered. In these circumstances, it would be unreasonable to assume that the jury could have differentiated and did differentiate between the *primary* duties of defendant as stated in instruction 2 and his *humanitarian* duties as stated in instruction 1. And plaintiffs' erroneous instruction 2 was not corrected or cured by defendant's instruction 6 *(which referred specifically to instruction 1* and conversed one essential element of plaintiffs' humanitarian submission) but rather conflicted therewith and was contradictory thereof. Anderson v. Prugh, supra, 364 Mo. loc. cit. 567, 264 S.W.2d loc. cit. 365 (14).

■ In fine, the inherent vice of instruction 2 was that it was not "so worded as to exclude a recovery based on primary negligence." White v. Kansas City Public Service Co., supra, 347 Mo. loc. cit. 898, 149 S.W.2d loc. cit. 377(1); McDonough v. St. Louis Public Service Co., supra, 350 S.W.2d loc. cit. 746. See Cunningham v. Thompson, supra, 277 S.W.2d loc. cit. 610 (17); Sperry v. Tracy Dodge-Plymouth Co., supra, 344 S.W.2d loc. cit. 115. Viewed in the light most favorable to plaintiffs, instruction 2 confused and commingled duties imposed in primary negligence cases with those imposed under the humanitarian doctrine [Anderson v. Prugh, supra, 364 Mo. loc. cit. 566, 567, 264 S.W.2d loc. cit. 365] and was likely to have been understood as injecting primary negligence into the humanitarian submission. Sperry v. Tracy Dodge-Plymouth Co., supra, 344 S.W.2d loc. cit. 114. On the record before us, we are satisfied that instruction 2 was prejudicially erroneous.

Defendant also assigns error in the giving of plaintiffs' damage instruction 3, which included this language: "In determining the amount of such necessary pecuniary injury, if any, the law does not afford you an exact standard of measurement more accurate than that given above, but it does permit you to take into consideration your common knowledge and experience in life in connection with all the evidence relating to such injury, if any * * *." Similar language has been expressly condemned as prejudicially erroneous. Vinson v. East Texas Motor Freight Lines, Mo., 280 S.W.2d 124, 133(9); Petty

v. Henroid, Mo., 313 S.W.2d 688, 690(4); Downing v. Dixon, supra, 313 S.W.2d loc. cit. 649(2). Citing Brewer v. Rowe, 363 Mo. 592, 252 S.W.2d 372, plaintiffs contend that the giving of their instruction 3 did not constitute reversible error because the court also gave defendant's instruction 4 properly directing the jury as to the allowance of damages in an action of this character. Since the case must be reversed and remanded anyway, we do not further prolong this opinion by discussion of this point; but, if the case is retried under our present system of instructing the jury, obviously the quoted language should not be used.

For the reasons stated, the judgment for plaintiffs is set aside and the cause is remanded for retrial.

RUARK, P. J., and HOGAN, J., concur.