**Wallace Byron SHELTON and Lydia J. Shelton, Plaintiffs-Respondents,**

**v.**

**Mark James BRUNER, Defendant-Appellant.**

**No. 8895.**

Springfield Court of Appeals.

Missouri.

Dec. 30, 1969.

Farrington, Curtis & Strong, E. C. Curtis, Springfield, for defendant-appellant.

Daniel, Clampett, Ellis, Rittershouse & Dalton, William A. R. Dalton, Springfield, for plaintiffs-respondents.

STONE, Judge.

In this jury-tried action at law arising out of a vehicular collision, plaintiff Wallace B. Shelton was awarded $3,500 for personal injuries and $500 for property damage and plaintiff Lydia J. Shelton was awarded $250 for loss of consortium. Defendant Mark James Bruner appeals.

The accident under consideration occurred about 3 P. M. on Sunday, September 24, 1967, a clear, sunny day, on Route M some five miles west of Highway 160 in Greene County, Missouri. At and near the point of accident, Route M "is straight but hilly" and has an asphalt roadway approximately 22 feet in width with an interrupted white center line. No-passing zones are marked with solid yellow lines. The north shoulder of the road is about six feet in width, the south shoulder about four feet.

Plaintiff Wallace (referred to as plaintiff), then 56 years of age, alone in his 1951 Chevrolet sedan, and westbound on Route M en route to his farm home 16 miles southwest of Springfield, was traveling "uphill" in the north or westbound traffic lane at a speed of about 40 miles per hour. Defendant Bruner, then a high school junior[1] at Republic, accompanied by schoolmate James Michael Beshears, and eastbound on Route M en route to the farm of Beshears' grandparents to "go hunting," was driving (with prior parental permission) a 1963 Studebaker sedan owned by defendant's father.

*Plaintiffs' evidence.* Plaintiff testified that, as he was proceeding westward uphill, he first saw an approaching eastbound automobile (identified by defendant's witness Beshears, and hereinafter referred to, as a blue Ford), when it was "about six car lengths" distant—an intervening space immediately translated by plaintiffs' counsel into "approximately a hundred feet." Returning to plaintiff's testimonial account, "the next thing I knew this other car [defendant's eastbound Studebaker] . . . whipped out to pass"; it was in plaintiff's lane of travel when he first saw it. He "immediately" applied his brakes and "pulled towards the right" so that, at the time of accident, plaintiff's Chevrolet was angling in a northwesterly direction with both front wheels and the right rear wheel on the right-hand or north shoulder of the road. Plaintiff essayed no estimate of the speed of defendant's automobile. According to plaintiff, "he [defendant] slammed on his brakes, I suppose, to get back in line and he couldn't do it; it [the Studebaker] went out of control and he slid sideways over on my side." The impact was between the right side of defendant's

skidding or sliding Studebaker and the front end of plaintiff's Chevrolet. Plaintiffs' witness Williams, the investigating trooper of the Missouri State Highway Patrol, found a set of skidmarks, 22 feet in length, leading to plaintiff's Chevrolet and another set, 90 feet in length, leading to defendant's Studebaker. Photographs introduced as plaintiffs' exhibits show that one of the skidmarks leading to defendant's Studebaker began at a point near to, but south of, the interrupted white center line of the blacktop roadway while the parallel skidmark in that set began at a point several feet north of the center line, and that this set of skidmarks curved to the north, running off the north edge of the blacktop just west of the point of impact. In our view of the case, it becomes unnecessary to digest plaintiffs' evidence pertaining to alleged personal injuries and property damage.

*Defendant's evidence.* After defendant turned from Highway 60 onto Route M, he drove at a speed of about 55 miles per hour until he overtook another eastbound automobile, the blue Ford. Both eastbound vehicles were then in a no-passing zone marked with a solid yellow line on the south side of the interrupted white center line. Defendant followed "right behind" the blue Ford—"about a car length behind it" until he passed the east end of the yellow line in the south or eastbound lane, at which time and place he accelerated the speed of the Studebaker, "pulled out" to see if he could pass around the blue Ford, and then first sighted plaintiff's approaching westbound Chevrolet. Defendant insisted that, from his position behind the blue Ford, he could not see the Chevrolet before he "pulled out." When asked to describe his "first reaction" upon discovery of the Chevrolet,

---

[1]. Although defendant's precise age was not shown, he was a minor at the time of accident. However, the record affirmatively shows that prior to trial one James T. Bruner, presumably defendant's father, filed his written consent to serve as guardian ad litem and in that capacity then refiled defendant's amended answer, and

that defendant appeared in person and by his guardian ad litem and attorneys of record. See V.A.M.R. Rule 52.02, subds. (i), (j) and (k); V.A.M.S. §§ 507.190, 507.200 and 507.210; Cox v. Wrinkle, Mo., 267 S.W.2d 648(1–7); Quincy v. Quincy, Mo.App., 430 S.W.2d 638(3–6).

defendant said "I slammed on my brakes and tried to get back in my lane" but "the [blue Ford] beside me in some way had slowed down or did something—anyway he was where I couldn't get right back in my lane." Plaintiff's Chevrolet was "still coming at me," so defendant turned to his left and, with the brakes on the Studebaker continuously applied, headed for the north shoulder as "the only possible way I could see to avoid the accident." He "guessed" that, when the front wheels of the Studebaker went onto the shoulder, the automobile "started sliding sideways." With plaintiff likewise heading for the north shoulder, the hereinbefore-recorded result was an impact between the right side of the skidding or sliding Studebaker and the front end of plaintiff's Chevrolet.

Generally speaking, defendant's passenger Beshears confirmed defendant Bruner's testimony. We note specifically that Beshears first saw plaintiff's approaching Chevrolet when defendant "speeded up" and "pulled over" into the left-hand or north lane to pass around the blue Ford; and that, when asked how far distant plaintiff's Chevrolet was when he first saw it, Beshears responded "I wouldn't know . . . it happened too fast" and agreed with cross-examining counsel when he snapped his fingers, "yes, about like that."

■ In their verdict-directing instructions, plaintiffs submitted in the disjunctive, as our present practice requires [MAI 1.02], two improper acts, to wit, failure to keep a careful lookout or driving on the wrong side of the road. Unless there was sufficient evidence to support submission of both acts, the giving of those instructions constituted error.[2] Defendant frankly concedes submissibility on the act of defend-

ant's driving on the wrong side of the road but vigorously insists that failure to keep a careful lookout was not submissible on the evidence adduced. In our appellate inquiry as to submissibility of that assignment, we consider the evidence in the light most favorable to plaintiffs and accord to them the benefit of all supporting inferences fairly and reasonably deducible from the evidence, tempered only by the wise, judicious limitation that this rule calls for consideration of all, not merely an isolated part or parts, of the facts shown by plaintiffs and does not require or authorize the court to supply missing evidence, or to give plaintiffs the benefit of forced or unreasonable inferences, or to disregard the dictates of common reason and accept that which, on the whole record, obviously is not true.[3]

Instant defendant contends that failure to keep a careful lookout was not submissible because there was no competent and substantial evidence to permit and support a finding (a) that defendant could have seen plaintiff's Chevrolet sooner than he did or (b) that defendant saw, or in the exercise of the highest degree of care could and should have seen, that automobile in time thereafter to have avoided the accident.

*Of (a).* It will be recollected that the only evidence concerning the relative positions of defendant's eastbound Studebaker and the blue Ford *before* the Studebacker "whipped out" or "pulled out" across the center line and into the westbound lane of travel was the testimony of defendant himself who said that he had been following "right behind" the blue Ford— "about a car length behind it" until he had passed the east end of the yellow line

---

2. MAI 17.02, Notes on Use; MAI 1.02, Committee's Comment, p. 7; Wolfe v. Harms, Mo., 413 S.W.2d 204, 209–210 (1); Johnson v. Bush, Mo.App., 418 S.W.2d 601, 606(9); Janicke v. Hough, Mo.App., 400 S.W.2d 645, 647.

3. Adler v. Laclede Gas Co., Mo., 414 S.W. 2d 304, 306(1); Kirks v. Waller, Mo.,

341 S.W.2d 860, 863(2, 3); Atcheson v. Braniff International Airways, Mo., 327 S.W.2d 112, 117(7); Graham v. Conner, Mo.App., 412 S.W.2d 193, 198(3); Dillon v. Hogue, Mo.App., 381 S.W.2d 599, 600(1); Reames v. St. Louis-San Francisco R. Co., Mo.App., 359 S.W.2d 230, 235(2); Hunter v. Karchmer, Mo. App., 285 S.W.2d 918, 928(2).

denoting a no-passing zone for eastbound vehicles. Defendant said that he *could not* see plaintiff's Chevrolet before he "pulled out"; and plaintiff stated that he *did not* see defendant's Studebaker until "after it whipped out to pass" and "supposed" that defendant could not have seen him sooner—a supposition seemingly not unreasonable in the stated circumstances. Cf. Johnson v. Bush, Mo.App., 418 S.W.2d 601, 606. Upon trial, defendant testified that he saw plaintiff's Chevrolet "immediately" when he "pulled out" to pass around the blue Ford, and that this initial view was had when "I nosed [the Studebaker] out to see if I could pass" and before it was "completely" in the north or westbound lane—a statement consonant with and supported by the physical fact that the right-hand skidmark made by the Studebaker started on the south side of the interrupted white center line of the blacktop roadway.

Plaintiff's trial reckoning was that he did not see the eastbound blue Ford until it was "about six car lengths" or "approximately a hundred feet" distant, so the intervening distance between his Chevrolet and defendant's Studebaker when the latter vehicle "whipped out to pass" (that being "the next thing I knew") and was initially sighted by plaintiff would have been even less. However, the physical facts not only serve to illustrate the frailty and fallibility of such testimonial estimates but also demonstrate that the intervening distance between plaintiff's and defendant's automobiles when each driver initially sighted the other and perceived impending danger must have been considerably more than six car lengths or one hundred feet. For plaintiff at 40 miles per hour would have traveled about 44 feet during his reaction time of $\frac{3}{4}$ second [4] and thereafter 22 feet, the measured length of the Chevrolet's skid-marks, or a total of some 66 feet to the point of accident, and defendant at 55 miles per hour would have traveled about 60 feet during his reaction time of $\frac{3}{4}$ second and thereafter 90 feet, the measured length of the Studebaker's skidmarks, or a total of some 150 feet to the point of accident, thus indicating an intervening distance of some 216 feet between the two vehicles when the drivers sighted each other.

As indicating that defendant had not seen plaintiff's automobile as soon as he could and should have done so, plaintiffs' counsel in oral argument pointed to this question and answer among those culled from defendant's pretrial deposition and read into evidence: "Q. Do you know what speed you had accelerated to? A. Just enough to get beside the [blue Ford] a little ways and then I seen [plaintiff's] car." When plaintiff's testimony is considered in its entirety as it should be [Bridges v. Arkansas-Missouri Power Co., Mo.App., 410 S.W.2d 106, 111–112(6)], we think the intended meaning of this enigmatic answer probably was that more clearly conveyed by defendant's above-noted testimony that he saw plaintiff's Chevrolet when "I nosed [the Studebaker] out to see if I could pass" and before it was "completely" in the north or westbound lane, and that both answers should be considered with the further explanatory statement that "I put on my brakes and tried to get back over, but just enough of the front end of [the Studebaker] was where I couldn't get right over there in that [south or eastbound] lane." In this connection, we recall also the testimony of defendant's passenger witness Beshears on cross-examination that the "rear end [of the blue Ford] was by our front and we couldn't pull back in" the south or eastbound lane.

---

4. Unless a longer time affirmatively appears in evidence, courts assume a reaction time of $\frac{3}{4}$ second [Vietmeier v. Voss, Mo., 246 S.W.2d 785, 788(5); Koogler v. Mound City Cab Co., Mo., 349 S.W.2d 233, 237(6); Roach v. Lacho, Mo., 402 S.W.2d 344, 350(11); Schneider v. Dannegger, Mo.App., 435 S.W.2d 416, 419(4)], which appears to be a relatively fast time. Dillon v. Hogue, Mo.App., 381 S.W.2d 599, 604 (note 4). See Ochs v. Wilson, Mo.App., 427 S.W.2d 748, 753; Am.Jur.2d Desk Book, Doc. No. 176, p. 456.

We have considered carefully the earnest contention of plaintiffs' counsel that the photographs in evidence establish that defendant could have seen plaintiff's Chevrolet sooner than he did. Ten 8″ x 10″ photographs were received in evidence without objection. Five of these were photographs of the damaged vehicles taken before either was moved following the collision. Three of the remaining five photographs depicted views which a westbound driver such as plaintiff might have had from various points traveling upgrade toward the crest of the hill. All of these three photographs showed a solid yellow line on the north side of the interrupted center line denoting a no-passing zone for westbound vehicles, but none of them disclosed the east end of the yellow line on the south side of the interrupted center line marking the no-passing zone (beyond or west of the crest) through which defendant's eastbound Studebaker passed just prior to the accident.

Only two photographs were views of the highway with the camera facing east, the direction defendant was traveling. One of those, plaintiffs' exhibit 2, portrays the set of skidmarks made by defendant's eastbound Studebaker and appears to have been taken from a point in the north or westbound lane relatively near to the west end (the beginning point) of that set of skidmarks; but it likewise does not show the east end of the yellow line denoting the no-passing zone through which the Studebaker traveled just before turning out to pass around the blue Ford. The other photograph looking east, plaintiffs' exhibit 1, appears to have been taken from a point in the westbound lane slightly *north* of the center line of the highway and several hundred feet west of the point of collision. In the foreground of the photograph there is a solid yellow line on each side of the interrupted white center line denoting no-passing zones for both eastbound and westbound traffic. *If* the east end of the yellow line marking the no-passing zone for east-

bound vehicles such as defendant's Studebaker is shown in the background of this photograph (as to which close examination leaves us uncertain), nevertheless this photograph, standing alone sans testimony, neither portrays defendant's view just before he turned out to pass around the blue Ford (or, for that matter, at any prior time) nor negates the existence of a "dip" at the bottom of the hill in which a westbound vehicle would be for a time wholly or partially out of the view of an eastbound driver approaching the crest. To embrace a contrary conclusion in the absence of supporting evidence would gratuitously and unjustifiably brand the methodical work of the State Highway Commission in marking no-passing zones on open highways as a senseless exercise in inane futility, if not a deliberate design to compound confusion. Strangely if not significantly with counsel contemplating submission on failure to keep a careful lookout, the individual who took the photographs offered by plaintiff did not testify and there was no specific statement by any witness (a) as to the sight distance from any given point or (b) as to the distance from the east end of the yellow line denoting the no-passing zone for eastbound vehicles to the west end of the set of skidmarks left by defendant's Studebaker.

Finally and importantly, plaintiffs' reliance upon photographs completely ignores the relative positions of defendant's Studebaker and the blue Ford before defendant turned out to pass around, concerning which the only definite and meaningful testimony was that defendant had been following "right behind" the blue Ford— "about a car length behind it" until he passed the east end of the yellow line marking a no-passing zone for eastbound vehicles. In those circumstances, defendant's sight distance ahead obviously would have been restricted to a marked extent until he turned out, for he could not bend his vision around the blue Ford. Cf. Fuz-

zell v. Williams, Mo.App., 288 S.W.2d 372, 376(10).

■ The burden rested on plaintiffs to show facts and circumstances essential to submission of the negligence charged. Williams v. Boone, Mo.App., 413 S.W.2d 36, 40(2). In fine, we are of the opinion that there was "no basis of substantial evidence" [Hawkeye-Security Ins. Co. v. Thomas Grain Fumigant Co., Mo.App., 407 S.W.2d 622, 625] to support a finding that, in the exercise of the highest degree of care, defendant could and should have seen plaintiff's Chevrolet sooner than he did.[5] However, we need not and do not rest our disposition of the appeal on this ground alone.

■ *Of (b).* To be *actionable,* negligence must be a proximate cause of injury.[6] Hence, failure to keep a careful lookout, negligent though it is, does not become actionable and submissible in the absence of substantial evidence from which the triers of the facts reasonably may find that, in the exercise of the highest degree of care, defendant could and should have seen plaintiff *in time thereafter to have taken effective precautionary action.*[7] And, "[h]aving the means and ability to avoid a collision means not only the mechanical appliances, such as steering apparatus with which to swerve, signaling equipment with which to warn, or braking appliances with which to slow down or stop, but also the existence of sufficient time and distance, considering the movements and speeds of the vehicles, to enable the party charged to take effective action in avoidance." Zalle v. Underwood, Mo., 372 S.W.2d 98, 102(2); Stegall v. Wilson, Mo.App., 416 S.W.2d 658, 662(3). See Thompson v. Gray, Mo.App., 415 S.W.2d 299, 305–306(5).

*If* defendant could have seen plaintiff's westbound Chevrolet before he "pulled out" to pass around the blue Ford, obviously he could have taken effective precautionary action. But as we have noted, defendant said that he *could not* see the Chevrolet before he "pulled out," and plaintiff *did not* see defendant's Studebaker until "after it whipped out to pass" and "supposed" that defendant could not have seen him sooner. We may not indulge and act upon a supposition to the contrary. The only evidence on the subject is that, when defendant did pull out and then sighted plaintiff's Chevrolet, he "slammed on" his brakes and attempted to return to the south or eastbound lane but could not do so on account of the position of the blue Ford; and the record presented to us would not support a contrary inference.[8] As we have pointed

5. O'Neill v. Claypool, Mo., 341 S.W.2d 129, 135(12); Levin v. Caldwell, Mo., 285 S.W.2d 655, 659(3); Williams v. Boone, Mo.App., 413 S.W.2d 36, 40(3); Hawkeye-Security Ins. Co. v. Thomas Grain Fumigant Co., Mo.App., 407 S.W. 2d 622, 625; Harris v. Lane, Mo.App., 379 S.W.2d 635, 639(9), app. to transfer denied by Mo.Sup., No. 50942.

6. Branstetter v. Gerdeman, 364 Mo. 1230, 1237, 274 S.W.2d 240, 245(2); Brassfield v. Sears, Mo., 421 S.W.2d 321, 325; Knollman v. Kennedy, Mo.App., 429 S. W.2d 775, 779; Walker v. Massey, Mo. App., 417 S.W.2d 14, 21(5); Graham v. Conner, supra note 3, 412 S.W.2d at 201(6, 7), and cases collected in note 14.

7. Zalle v. Underwood, Mo., 372 S.W.2d 98, 102(3); Miller v. St. Louis Public Service Co., Mo., 389 S.W.2d 769, 772 (4); Ochs v. Wilson, supra note 4, 427 S.W.2d at 751(2); Thompson v. Gray, Mo.App., 415 S.W.2d 299, 305–306(5); Graham v. Conner, supra note 3, 412 S.W.2d at 202(8); Bracken v. Koch, Mo.App., 404 S.W.2d 201, 204–205(6, 7).

8. "An inference is a deduction logically and properly drawn by reason from proven or admitted facts. It is more than, and cannot be predicated on, mere surmise or conjecture, i. e., ' " 'the possibility that a thing could have happened * * * an idea or a notion founded on the probability that a thing may have occurred * * *.' " ' Draper v. Louisville & Nashville R. Co., 348 Mo. 886, 893, 156 S.W.2d 626, 630; Louisville & Nashville R. Co. v. Mann's Adm'r., 227 Ky. 399, 13 S.W.2d 257, 258. An inference may not be forced, and guesswork does not constitute an allowable substitute." Smith v. Seven-Eleven, Inc., Mo.App., 430 S.W.2d 764, 769(4), and cases there collected in notes 3 to 9, inclusive.

out, the physical facts indicate that plaintiff's westbound Chevrolet and defendant's eastbound Studebaker were some 216 feet apart when the drivers sighted each other and when apparently the two vehicles first became intervisible. They were then closing the intervening gap at a combined speed of approximately 95 miles per hour or 139.33 feet per second and, in the assumed reaction time of ¾ second, they traveled about 104.5 feet and narrowed the intervening gap to some 111.5 feet. Each driver then seized upon the only course of action offering any hope of averting the impending catastrophe, namely, undertaking to stop his automobile and at the same time swerving to the north. However, the five photographs revealing the extensive damage to the front end of plaintiff's Chevrolet and to the right side of defendant's Studebaker stand as mute witnesses not only attesting the drivers' inability to avoid the collision but also revealing the substantial force of the impact.

The record affords a solid evidentiary basis for our knowledge that plaintiff's Chevrolet and defendant's Studebaker could not have been stopped within an intervening distance of some 216 feet. However, we are not endowed with judicial knowledge as to the *exact distance* within which those vehicles could have been stopped under the circumstances existing at the time and place of accident;[9] and any effort to probe the hazy, undelineated area of professed judicial knowledge as to the *limits* within which the drivers could have stopped their vehicles would be fatuous and vain because,

*even if* (contrary to our announced determination) defendant might have seen plaintiff's Chevrolet somewhat sooner than he did, nevertheless the record affords and plaintiff's counsel suggest no basis whatever for a determination of the intervening distance between the automobiles at that time, and thus no support for a finding, essential to submission of failure to keep a careful lookout, that defendant could and should have seen plaintiff *in time thereafter to have taken effective precautionary action.*

Plaintiff assumed the burden of showing a causal connection between the submitted negligence, i. e., failure to keep a careful lookout, and the injury sustained [Osterhaus v. Gladstone Hotel Corp., Mo., 344 S.W.2d 91, 94(4); Smith v. Seven-Eleven, Inc., Mo.App., 430 S.W.2d 764, 770; Prosser on Torts (2nd Ed.), § 44, l.c. 222], such that the injury would not have happened but for the negligence.[10] We recognize that, as plaintiff's counsel emphasize, causal connection need not be established by direct and positive evidence but may be shown by proof of facts and circumstances from which such connection reasonably may be inferred. Cox v. Moore, Mo.App., 394 S.W. 2d 65, 70(10, 11); Cluck v. Snodgrass, Mo. App., 381 S.W.2d 544, 548(2); Leek v. Dillard, Mo.App., 304 S.W.2d 60, 65(10). But if, as we are constrained to conclude, the evidence left the element of causal connection in the nebulous twilight of speculation, conjecture and surmise, plaintiff did not carry his burden and the judgment for him cannot stand.[11] On account of the

9. Perry v. Dever, Mo., 303 S.W.2d 1, 7 (14); Nelms v. Bright, Mo. (banc), 299 S.W.2d 483, 490(17); Mallow v. Tucker, Mo., 281 S.W.2d 848, 851(4); Eaves v. Wampler, Mo.App., 390 S.W.2d 922, 930(17).

10. Branstetter v. Gerdeman, supra note 6, 364 Mo. at 1237, 274 S.W.2d at 245 (2); Donnelly v. Goforth, Mo., 284 S.W. 2d 462, 466(9, 10); Springer v. Security Nat. Bank Savings & Trust Co., Mo., 175 S.W.2d 797, 800(5, 7); Annin v. Jackson, 340 Mo. 331, 100 S.W.2d 872, 876(2); State ex rel. Boeving v. Cox, 310 Mo. 367, 276 S.W. 869, 871.

11. Gibson v. Newhouse, Mo., 402 S.W. 2d 324, 328–329; James v. Sunshine Biscuits, Inc., Mo., 402 S.W.2d 364, 375 (2); Osborn v. McBride, Mo., 400 S.W. 2d 185, 188(3); Rose v. Thompson, 346 Mo. 395, 141 S.W.2d 824, 829; Schabbing v. Seabaugh, Mo.App., 395 S.W.2d 256, 259(7), 260(9); Bauman v. Conrad, Mo.App., 342 S.W.2d 284, 288–289 (7); Blythe v. United Rys. Co. of St. Louis, Mo.App., 211 S.W. 695, 697(3).

unsupported submission therein of failure to keep a careful lookout, plaintiff's verdict-directing instructions 2 and 3 were prejudicially erroneous.

Since the evidence on retrial may not be the same, other questions raised in defendant's-appellant's brief need not be discussed or ruled here.

The judgment nisi is set aside and the cause is remanded for retrial.

TITUS, P. J., and HOGAN, J., concur.