JUANITA BRANSTETTER, Respondent, v. BERT D. KUNZLER, Appellant, CURTIS H. GERDEMAN and R.W. BEGHTOL, Defendants, No. 44054 —274 S. W. (2d) 240.

Division Two, January 10, 1955.

―――――――――

*Hunter, Chamier & Motley* for appellant.

*Lamb & Semple* for respondent.

█ BOHLING, C.—Juanita Branstetter sued Bert D. Kunzler, Robert W. Beghtol and Curtis H. Gerdeman for personal injuries, asking $65,000 damages. Plaintiff was injured when Gerdeman's 1950 Nash automobile ran into the rear of Beghtol's 1951 Austin and caused it to run into the rear of Kunzler's 1950 Chrysler, in which she was riding. We understand the automobiles were sedans. Gerdeman cross-claimed against Kunzler and Beghtol. Kunzler cross-claimed against Gerdeman. At the beginning of the trial plaintiff settled her claim against Gerdeman for $10,500. Beghtol testified that Gerdeman had paid him for his injuries and the damages to his automobile. The court sustained Beghtol's separate motions at the close of all the evidence for a directed verdict on plaintiff's claim and for a directed verdict on Gerdeman's cross-claim. The court overruled Kunzler's motion for a directed verdict on plaintiff's claim but sustained his motion for a directed verdict on Gerdeman's cross-claim. Prior to submission to the jury Kunzler's cross-claim █ against Gerdeman was compromised and settled. The jury returned a verdict for Kunzler and against plaintiff. Judgment was entered in conformity with the foregoing. Thereafter plaintiff's motion for a new trial was sustained only as to defendant Kunzler for error in giving said defendant's instruction on plaintiff's contributory negligence. Kunzler has appealed from the new trial order, contending plaintiff failed to establish said defendant's negligence on the grounds submitted and that his instruction on contributory negligence was not erroneous.

Plaintiff alleged several grounds of negligence against defendant Kunzler. She made like charges against defendant Beghtol. She submitted her case, so far as material here, as follows: That defendant Kunzler negligently and carelessly failed to exercise the highest degree of care "by negligently and carelessly suddenly checking the speed or stopping his automobile on the highway when there was no immediate danger of colliding with the automobile being operated immediately in front of defendant Bert D. Kunzler's automobile, and if you further find that he negligently and carelessly failed to give a timely warning to operators of motor vehicles in the rear of his intention to suddenly check the speed or stop his automobile by extending his arm in a horizontal position so that the same could have been seen in the rear of his vehicle and that such failure was negligence notwithstanding you may find and believe from the evidence that said defendant's automobile was equipped with an electrical signalling device which upon application of the brake displayed a signal visible from the rear indicating an intention to stop * *."

We mention here that neither Kunzler nor Beghtol gave an arm signal but each gave a warning signal by the red lights on the rear fenders.

Plaintiff did not caution or complain to Kunzler at any time about his operation of the Chrysler.

All witnesses mentioned were plaintiff's witnesses, except witnesses Kunzler and Gerdeman. We take the facts, legitimate inferences and presumptions favorable to plaintiff. Many facts are not in dispute.

The collision occurred between 5 and 6 p.m., Sunday, July 1, 1951, on U. S. Highway 40 (an east-west highway) at or just past the steel superstructure (estimated to be 50 to 75 yards west of where the concrete bridge structure begins) on the approach for westbound traffic of the Daniel Boone bridge over the Missouri river. The bridge spans the river in a north-south direction, but for convenience we speak of the traffic as westbound and eastbound.

The highway is a three-lane concrete pavement. The three automobiles were traveling in the right-hand lane for westbound traffic. The sun was shining and the day was warm and dry.

On that Sunday morning Kunzler had taken some friends to see a baseball game in St. Louis and they were on their return to Moberly, Missouri, their home. Kunzler was driving. Plaintiff was seated on the front seat. Thomas Hull, on the left, and Miss Louise Martin, on the right, were on the back seat.

Robert W. Beghtol had just returned from Germany, where he was an employee of the State Department. He was enroute to Lincoln, Nebraska, where his folks lived. He left Indiana that morning. He brought the Austin with him from Germany. He was required to have his car inspected before leaving Germany and everything, including his rear warning lights, was operating properly. He checked them just before leaving St. Louis and they were functioning properly then.

The Missouri river was at flood stage on the day in question; and defendant Gerdeman took his wife and Neal Odelheid, their nephew, then 11 years old, on a "sight seeing" trip in his Nash to see the flood. They lived at Wentzville, about 14 miles northwest of the bridge.

Briefly: Kunzler passed Beghtol 1½ miles or so before reaching the bridge. Gerdeman, who originally was eastbound, entered the line of westbound traffic some distance behind the Austin. The traffic on the bridge slackened speed or stopped. Kunzler and Beghtol slowed down or stopped with the traffic. Gerdeman, however, ran into the Austin, knocked it against the Chrysler and plaintiff was injured.

There is no dispute about the traffic being heavy on Highway 40 out of St. Louis that day. It would slow down at times and then start forward again. This occurred "on numerous occasions." In the vicinity of the Daniel Boone bridge "sight-seers" were standing along the shoulder of the highway looking at the flood waters and

the automobile traffic over the bridge was very heavy in both directions.

The Chrysler was traveling with the traffic and the witnesses gave different estimates of the speed of the traffic, placing it between 20 and 40 miles an hour, most of them, including plaintiff, stating 30 miles an hour. A Pontiac automobile was immediately ahead of the Chrysler. Hull estimated the Chrysler was 30 feet behind the Pontiac. Kunzler estimated the distance at 20 to 40 feet. Kunzler glanced at different times in the rear view mirror and knew traffic was back of his Chrysler. He did not pay particular attention to these cars or to the distances. Asked how far behind, he stated it would be hard to estimate through the rear view mirror but "speculated" the first car was between 30 and 60 feet behind. Beghtol testified he was 35 feet behind Kunzler and traveling 30 miles an hour.

The approach of the bridge is upgrade for westbound traffic. Kunzler noticed braking signal lights come on ahead. He could see the braking signals on more than one car as some cars veered to the side and because of the upgrade. He applied his brakes as quickly as he saw the lights. No one knew why the traffic slowed. There is no testimony of any prior intention of Kunzler to stop on the bridge. Plaintiff and her witness Hull, as well as others, testified that the traffic slowed. Hull estimated that the Chrysler rolled up to within something like 4 or 5 feet of the Pontiac. Miss Martin testified the Chrysler got within 10 feet of the Pontiac. Plaintiff could not give the distances but she could not see the pavement between the Chrysler and the Pontiac just before the Chrysler was struck in the rear. Kunzler estimated he drove 20 to 50 feet back of the Pontiac and the distance probably closed some, maybe 20, 30 feet.

Plaintiff, when Kunzler started slowing, was relaxed, sitting side ways, facing Kunzler, and reading the score card she kept at the ball game. Plaintiff thought the Chrysler never "stopped completely." She felt the Chrysler "begin to slow pretty fast," a sudden slowdown, and she looked up and saw the Pontiac "stopped or slowed down" and glanced back down when she saw "we weren't going to hit." Plaintiff testified with respect to the suddenness of the "slow- down": "The suddenness would be if you were driving up to the stop sign expecting to go through it, and it changed from go to stop." Beghtol, and perhaps another witness, thought the Chrysler came to a stop, but the other witnesses were of the opinion it only slowed down. Hull was of the opinion it was increasing speed when struck in the rear. Hull said it was "a fairly sudden stop," explaining he meant slowing down, and that Kunzler did not skid his tires. Miss Martin testified "we didn't come to a sudden stop. I know that." Kunzler testified the Chrysler moved forward only a few feet after being struck.

Beghtol, in addition, testified that after the Chrysler passed him

there had been intermittent decreases and increases of speed in the line of traffic. He had no difficulty in seeing the red signals on the two rear fenders of Kunzler's Chrysler. He heard no squeak of brakes or anything like that. He put on his brakes to reduce his speed as soon as he saw the signals on the Chrysler. He estimated he traveled 55 or 60 feet before he stopped and that the Austin was 2 inches behind the Chrysler when the Austin stopped, but it did not then strike the Chrysler. He saw the Nash back of him immediately upon stopping "but prior to that while I was driving along, no." He could not answer with truthfulness how far the Nash was behind "because I didn't notice." When he stopped, he saw the Nash in the rearview mirror and, while it was "awfully hard to say," he thought it was 40 feet away, coming fast. He estimated that in 2 seconds the Nash hit the Austin. When the Nash struck, it knocked the Austin forward and into the Chrysler, and after that the Nash was some distance behind the Austin.

Hull, Beghtol and State Patrolman Schacher testified that Gerdeman told them he took his eyes off of the traffic for a minute and was looking at the high water until his nephew told him to stop when he was "right on" the Austin. His nephew thought Gerdeman did not see the Austin stop and that Gerdeman had not slowed down when he "hollered" to him.

After the crash one could not walk between the Chrysler and the Austin, but Schacher paced 23 paces between the Austin to the debris on the highway. Hull didn't know for sure but thought the Nash was about 25 feet back of the Austin immediately after the crash.

When plaintiff heard the crash of the Nash striking the Austin she looked up from the score card, turned around and looked out of the window. About that time the Chrysler was struck by the Austin. This caused her head to be thrown and jerked back, its right side striking the car and injuring her.

Gerdeman testified that, after he turned his Nash around ¾ of a mile east of the bridge, he entered the westbound traffic line perhaps several hundred yards back of the Austin. He drove fast enough to close up most of the space before reaching the bridge. As near as he could guess, the Austin was 75 feet ahead the last time he saw it moving. He thought he was traveling 25 miles an hour, but could not say whether he was going faster, and probably could have stopped in 40 feet. Mrs. Gerdeman and he were talking about and looking at the flood. Their 11 year old nephew, plaintiff's witness, riding in the back seat noticed that the car in front of his uncle had stopped and thought his uncle had not seen this. When his uncle, who had not "slowed up," was "pretty close," was about 15 feet from it— "about as far as from here to you," the distance from witness to counsel, he "hollered 'look out.'" The first Gerdeman knew he was

close to anyone, was when his nephew "hollered 'watch out.'" He estimated he was then probably 40 or 50 feet back of the Austin. "Why before I knowed it" the Austin and Chrysler, "stopped right in front of me and I just didn't get stopped in time, I guess." He put on his brakes, they were good brakes, as hard as he could. Asked on direct examination whether he had any warning of a stop from the Chrysler or the Austin, he answered "Not that I know of," and that he did not see any. But on cross-examination he explained that he had not observed the cars in front slowing down until his nephew said "watch out," and "by that time we'd done crashed"; that his nephew's warning and the crash were "almost instantaneous"; and that after he entered the line of traffic he did not see the Chrysler until after the crash and did not know whether its brake lights came on or whether it was stopped.

Mrs. Gerdeman, on the front seat with her husband, had her nose and an arm broken in the crash, and Gerdeman's Nash was damaged to the extent of $1,100.

Plaintiff predicated a verdict on Kunzler's negligence in suddenly slowing down or stopping his Chrysler when no emergency existed *and* failing to give a timely warning, in addition to the warning given by his stop lights, by extending his arm in a horizontal position to operators of vehicles following him of his intention to slow or stop. The submission was in the conjunctive. Lindquist v. Kansas City Pub. Serv. Co., 350 Mo. 905, 169 S. W. 2d 366, 370, 371; McCarty v. Milgram Food Stores, Inc., Mo., 252 S. W. 2d 343, 344[2]. The charges of negligence not submitted stand abandoned. Guthrie v. City of St. Charles, 347 Mo. 1175, 152 S. W. 2d 91, 95[4]; Hunt v. Chicago, M., St. P. & P. R. Co., 359 Mo. 1089, 225 S. W. 2d 738, 741[4]; Bowers v. Columbia Terminals Co., Mo. App., 213 S. W. 2d 663, 667[3].

The mere fact that injury follows negligence does not necessarily create liability. A causal connection must be established between the negligence charged or submitted and the loss or injury sustained, such that the injury would not have happened but for the negligence, and also that the negligence was not only a cause but was a proximate cause. Annin v. Jackson, 340 Mo. 331, 100 S. W. 2d 872, 876[2]; Springer v. Security Nat. Bk. S. & Trs. Co., Mo., 175 S. W. 2d 797, 800[5-7]; State ex rel. Boeving v. Cox, 310 Mo. 367, 276 S. W. 869, 871; Johnson v. Terminal R. Ass'n, 320 Mo. 884, 8 S. W. 2d 891, 893; 65 C. J. S. 650, § 104; 38 Am. Jur. 697, §§ 51, 54, 166.

Plaintiff relies upon the following to sustain the submission of her case. In Matthews v. Mound City Cab Co., Mo. App., 205 S. W. 2d 243, 246, the plaintiff was a passenger in a cab of one of the defendants. It was proceeding south at night at about 20 to 25 miles an hour 7 to 8 feet behind another cab, owned by the other defendant, in

a southbound streetcar track, about 12 to 13 feet from the street curb. One Wiseman, who was not named as a defendant and was driving 25 to 30 miles an hour, pulled out to pass the two cabs on the left when he observed he was approaching an intersection where he expected to turn. He thereupon slowed down and dropped in line about 5 or 10 feet behind the rear cab. The driver of the first cab observed two persons on the sidewalk and, upon one of them hailing his cab, he turned his cab slightly into an intersecting street and brought it to a sudden stop with the rear of the cab still on the streetcar track. The second cab ran into the rear of the first cab and Wiseman's car, he had just changed his foot from the brake to the accelerator, struck the rear of the second cab. Here the continuation of events were in such sequence as to permit of the negligence of each defendant being found a concurrent proximate cause of the collision and plaintiff's injuries. A reading of plaintiff's other authorities (Knox v. Weathers, 363 Mo. 1167, 257 S. W. 2d 912, 918; White v. Rohrer, Mo., 267 S. W. 2d 31, 34, and Ritz v. Cousins Lumber Co., 227 Mo. App. 1167, 59 S. W. 2d 1072, 1074) discloses in so far as they support plaintiff that they involved like factual situations to the Matthews case, differing perhaps in degree but not in the principle of law involved. In each the operator of the vehicle to the rear was observing the traffic ahead.

Section 304.020 provides in subsec. 8 that when the stopping or checking of speed of an automobile "may reasonably" affect the movement of other vehicles, the operator shall extend his arm in a horizontal position; but subsec. 11 provides that if the automobile be equipped with an electrical signalling device plainly visible from the rear and indicating an intention to stop or check speed, "the signals with the hand and arm, herein required, need not be given," requiring all enclosed automobiles owned by residents of municipalities of more than 10,000 population to be so equipped. This clearly indicates that in some instances the electrical signal is sufficient and the arm signal need not be given.

Plaintiff's evidence established that Kunzler slowed down or stopped with and because of the movement of the traffic ahead. Beghtol had no trouble in seeing the Chrysler's stop lights, one on each fender, when Kunzler applied his brakes. Kunzler did not collide with the Pontiac ahead and Beghtol did not collide with Kunzler's Chrysler. Under plaintiff's evidence on the material facts leading to the collision Gerdeman was driving ahead looking at the flood waters without slackening his speed or looking ahead until his nephew yelled to him to "watch out," and then he was "right on" Beghtol's Austin. He knocked it forward and into Kunzler's Chrysler in which plaintiff was riding, the point of impact being quite some distance back of where Beghtol's Austin stopped after the crash. Beghtol was stopped for about two seconds before the crash and he kept his foot on the brake and his stop lights were on. Gerdeman, the only witness

testifying on the fact, stated Beghtol was, he guessed, 75 feet ahead of him when he last saw Beghtol's Austin moving, and that he, Gerdeman, could probably have stopped in 40 feet.

Ward v. Missouri Pac. R., Co., 311 Mo. 92, 277 S. W. 908, 911, states: "The timely warning of an approaching train is a warning in time for one who is warned to avoid being hit by it." Again, the traffic caused Kunzler to check his speed. He had no prior intention of slowing down on the bridge. It appears that in the instant circumstances Kunzler could as quickly, if not more quickly, warn by applying his brakes as by extending an arm out of the window in a horizontal position. Kunzler's warning was timely for Beghtol, who stopped. Gerdeman did not see the stop signals because at the time he was looking at the flood waters and was not looking ahead.

Plaintiff was not injured when Kunzler slowed down or stopped.

A motorist has the right to some extent to assume that other motorists will obey the law of the road and exercise proper care in the absence of any indication to the contrary. 60 C. J. S. 610, § 249, 650, § 270; 40 C. J. S. 256, § 236, d; § 240, nn. 56, 57; 5 Am. Jur. 600, § 169; 25 Am. Jur. 532, § 239. A trailing motorist owes a duty to observe the traffic and signals of the motorist ahead. It is stated in 65 C. J. S. 693, § 111, d: "A prior and remote cause cannot be made the basis of an action if such remote cause did nothing more than furnish the condition or give rise to the occasion by which the injury was made possible, if there intervened between such prior or remote cause and the injury a distinct, successive, unrelated, and efficient cause of the injury, even though the injury would not have occurred but for such condition or occasion. If no danger existed in the condition except because of the independent cause, such condition was not the proximate cause." See also Id., § 111, f; De Moss v. Kansas City Rys. Co., 296 Mo. 526, 246 S. W. 566, 567; Smith v. Mabrey, 348 Mo. 644, 154 S. W. 2d 770, 772. The following cases involving rear-end automobile collisions are to the effect that in circumstances similar to those here presented the action of the front driver was not a proximate cause of the collision. Georgia Pow. Co. v. Blum, 80 Ga. App. 618, 57 S. E. 2d 18, 23, col. 2; Roberson v. Rodriguez, La. App., 186 So. 853, 855[3-6]; MacNeill v. Makos, 366 Pa. 465, 77 A. 2d 378, 379[1, 2]; Ellis v. McCubbins, 312 Ky. 837, 229 S. W. 2d 992, 994[1]; Webb v. Smith, 176 Va. 235, 10 S. E. 2d 503, 131 A. L. R. 558, 562; Szczytko v. Public Service Coord. Transport, 21 N. J. Super. 258, 91 A. 2d 116, 118; Riccio v. Ginsberg, 49 R. I. 32, 139 A. 652, 62 A. L. R. 967, 969; Hebert v. Keller, La. App., 17 So. 2d 746, 747[3]; 5 Am. Jur. 657, § 281; Annotation, 29 A. L. R. 2d 5; 2 Blashfield, Automobile Law, 107, §§ 931, 949, 963.

We conclude that Gerdeman's negligence was the proximate cause of the collision and plaintiff's injuries, and that the submitted acts of Kunzler were too remote to be causative in a legal sense and to impose liability.

1240

Plaintiff's submitted negligence of Kunzler's failure to give an arm signal had to be seen and acted upon to be effective. Under all the evidence Gerdeman would not have seen Kunzler's arm signal had it been given or any warning Kunzler might have given. A finding of causative negligence on Kunzler's failure to give an arm signal would rest in guesswork, speculation and conjecture.

If Beghtol, who saw Gerdeman's car approach and whom the jury could find was stopped for two seconds before Gerdeman crashed into his Austin, was entitled to have his motion for a directed verdict sustained notwithstanding his failure to warn by an arm signal, we think Kunzler, who was ahead of Beghtol and whose car Gerdeman did not see until after the collision, under like reasoning would not be guilty of said actionable negligence.

Plaintiff, under the record, relies on the presumption that Gerdeman was in the exercise of due care and would have seen and heeded the submitted warning had it been given. She adduced no affirmative proof that he was exercising care. The presumption passed out of the instant case when testimony came in that Gerdeman, who was on the approach to the bridge where he had a good view of the flood waters, was not looking ahead but was looking at the flood. "A presumption, therefore, of a rebuttable character, such as here [exercise of care], only remains in force until repelled by contrary evidence. It follows that when the evidence is contrary to the presumption invoked, the presumption itself cannot be laid hold of for use in administering justice in a particular case." Rodan v. St. Louis Transit Co., 207 Mo. 392, 409, 410, 105 S. W. 1061, 1066; State ex rel. United Mut. Ins. Ass'n v. Shain, 349 Mo. 460, 162 S. W. 2d 255, 263[11]; Lappin v. Prebe, 345 Mo. 68, 131 S. W. 2d 511, 513[6]; Rashall v. St. Louis, I. M. & S. R. Co., 249 Mo. 509, 522, 155 S. W. 426, 430. The instant plaintiff seeks to get away from not only the uncontradicted testimony of Gerdeman but testimony to like effect of her own witnesses.

What we have said disposes of this review, as alleged trial errors are immaterial where there is no case for the jury. Cottonwood Fibre Co. v. Thompson, 359 Mo. 1062, 225 S. W. 2d 702, 708[7]. We mention that the trial court expressed doubt as to the submissibility of plaintiff's case when ruling the new trial motion, but as he recalled the testimony thought the case was submissible.

The order granting a new trial is reversed and the cause remanded with directions to reinstate the verdict and enter judgment for defendant Kunzler. *Westhues* and *Barrett,* CC., concur.

PER CURIAM:—The foregoing opinion by BOHLING, C., is adopted as the opinion of the court. *Ellison,* P. J., *Leedy,* J., and *Cave* and *Anderson,* Special Judges, concur.