Kimberly Ann JACKSON, a minor, By her mother and next friend, Nita A. JACKSON, Plaintiff-Appellant,

v.

RAY KRUSE CONSTRUCTION COMPANY, INC., et al., Defendants-Respondents.

No. 67385.

Supreme Court of Missouri, En Banc.

April 15, 1986.

Rehearing Denied May 13, 1986.

Mark I. Bronson, St. Louis, for plaintiff-appellant.

John J. Horgan, St. Louis, for defendants-respondents.

BLACKMAR, Judge.

The plaintiff, Kimberly Ann Jackson, sued on account of injuries sustained in a collision with a bicycle on October 2, 1978, on the parking lot adjoining the apartment building in which she and her parents lived. She was four years old at the time. The defendants were the owner and the operator of the apartment building. The petition charged that the defendants had failed to make the parking lot reasonably safe. She recovered a verdict of $850,000, which is not challenged before us. The trial court set the verdict aside and entered judgment for defendants. The court also sustained an alternative motion for new trial, finding error in the verdict directing instruction. The Court of Appeals affirmed. We granted transfer and, taking the case as on original appeal, now reverse and direct the entry of judgment on the verdict. We of course are obliged to accept the facts which most strongly support the verdict.

The apartment complex consists of two buildings of 30 units each. A driveway with a 12 to 17 percent grade adjoins the complex on the west. A person going down the hill in a southerly direction passes successively the first building, a parking lot, and the second building (in which the plaintiff and her family lived), before reaching the lower parking lot where the accident took place. As many as 40 cars might be parked in the lower lot. The corner of the second building obscures the view of the lower parking lot from the driveway. To the east of the apartment complex is a trailer park, also owned by the defendants.

The accident occurred between 5 and 6 P.M. The plaintiff's father, Michael Jackson, was the only eyewitness. He was working on his car in the lower parking lot when the plaintiff's mother sent her to tell him that dinner was ready. His attention was attracted by a shout of "watch out"

and he saw a formation of three bicycles, with one ahead of the others. The plaintiff "froze" and the leading bicycle struck her. Although Jackson's testimony is not entirely clear and consistent, he stated that the point of impact was 55 feet east of the southwest corner of the building, and that the plaintiff ended up 75 feet from the southwest corner.[1] He could not estimate the speed of the bicycle because he saw it only momentarily.

The plaintiff adduced as an expert witness Boulter Kelsey, a consulting mechanical engineer. He testified over objection that, in his opinion, the bicycle which struck the plaintiff was traveling at least 24 feet per second, or 16.4 miles per hour, at the time of the collision. He reached this conclusion on the basis of a "straight drag calculation" on the assumption that plaintiff's body had traveled 20 feet, and said that neither the weight of her body nor that of the cyclist or the cycle was material.[2]

Kelsey testified that, in his opinion, a safety bump should have been installed diagonally across the driveway as it reached the entrance to the lower parking lot. The bump should be designed to prevent a bicycle from crossing at a speed greater than 10 miles per hour. At a higher speed the cycle would "become airborne" and could not turn in the air. If a bicycle were slowed to 3 or 4 miles per hour it could accelerate to approximately 11 miles per hour in the 55 foot distance to the point of the accident. Kelsey said that safety bumps were standard safety devices for use in parking lots for the purpose of slowing the speed of automobiles and other vehicles.[3]

There was ample evidence that boys were wont to drive their bicycles at substantial speed down the hill and into the lower parking lot, and that several complaints had been made to the resident manager before the accident. The boy whose cycle injured plaintiff lived with his family in the trailer park to the east. A path had been worn between the trailer park and the lower parking lot.

Ray Kruse, a representative of the defendants, testified that he was not aware of any complaints about bicycles in the parking lot until after the plaintiff was injured. He was aware of the use of speed bumps but asserted that they existed for the purpose of controlling automobile traffic. (The jury of course did not have to accept this conclusion, and could have accepted Kelsey's testimony that a bump was appropriate to control bicycle speed.) Kruse expressed doubt that a building permit would be issued for a speed bump but had made no effort to find out. He had no other suggestion for dealing with speeding bicycles unless a guard·were posted to warn cyclists off the parking lot. The defendants had another piece of property, of a very different nature, which had a speed bump at the time they acquired it.

■■■ The problem before us of course is whether the plaintiff should be allowed to go to the jury on the evidence presented. We are indebted to Judge Welliver for his research into scholarly writings about tort law. Our courts have followed the traditional analysis of negligence cases into the elements of duty, breach of duty and causation. *Virginia D. v. Madesco Investment Corp.*, 648 S.W.2d 881 (Mo. banc 1983); *Hoover's Dairy, Inc. v. Mid-America Dairymen*, 700 S.W.2d 426 (Mo. banc

1. During closing argument, defense counsel argued:
   > At the time that Mr. Jackson brought his little daughter in there they quote him as saying that she was moved or knocked ten feet as a result of the impact. In the courtroom he said twenty feet....

   The engineer was not cross-examined as to whether the difference between 10 feet and 20 feet was significant. According to the evidence the plaintiff was airborne for part of the distance and slid or rolled for the remainder.

2. Kelsey testified that height and weight of the victim and of the cyclist would be critical to a determination of exact velocity, but that, to determine minimum velocity less information is necessary.

3. Kelsey also suggested that there should be another bump further up the driveway.

1985). A landlord owes a duty to its tenants, strongly emphasized in recent cases, to make common portions of the leased premises reasonably safe.[4] This includes the duty to take notice of known dangers and to institute needed corrective measures. The duty extends to driveways and parking lots where there are problems about the speed of vehicles. *See Clifton v. Brown*, 253 Ark. 148, 484 S.W.2d 884 (1972), suggesting a speed bump as at least one possible precaution.

■ We of course must take the case as the parties present it. The plaintiff elected to go to the jury solely on the claim that the defendants were negligent in not installing a speed bump. She supported her claim with the testimony of an adequately-qualified expert, who expressed the opinion that a speed bump was indicated as a means of protection against speeding bicycles. He was not cross-examined as to other possibilities, and the defendants made no additional suggestions of safety measures, either through their principals or by expert testimony. The defendants also disclaimed knowledge of any problem with speeding bicycles. With the state of the record as it is, the jury could find that the defendants had notice of a condition which required the installation of a speed bump and were negligent for failing to provide it. It would be contrary to the course of the law for us to substitute our judgment for that of the jury as to whether the only safety precaution suggested was necessary, in the exercise of due care.

The defendants argue vigorously, however, that the plaintiff has not established the element of causation. The accident was precipitated, of course, by the bicycle rider, who no doubt could be faulted for excessive speed and inattention. There may, however, by more than one proximate cause of an accident. *Green v. Kahn, supra*. As Judge Welliver's opinion demonstrates, the subject of causation has been the subject of much discussion among legal scholars, often because of bizarre hypotheticals such as the one in which two persons fire at a third at the same time, with each inflicting a wound which would have been fatal without regard to the other shot. Another favorite has a person furnishing to another a car with brakes he knows to be defective, with the driver making no effort to apply the brakes. A recent article summarizing the views of the several distinguished commentators is that of Professor Richard W. Wright. 73 Cal.L.Rev. 1737 (Dec.1985) "Causation in Tort Law."

This case would be characterized by Professor Wright as one of "doubtful" causation, akin to a case involving a public swimming pool in which a child drowns while the lifeguard is absent. It is extremely difficult to prove that the drowning would not have occurred if the lifeguard had been present, but it would certainly be reasonable for a jury to conclude that the presence of a lifeguard would make the chances of rescue "more likely than not." Professor Wright argues that no more should be required and his view has substantial support.[5] There are obvious difficulties in this case in setting up a counterfactual situation which definitively projects the sequence of events under the assumption that a safety bump had been in place. Striving for certainty is a *tour de force*. The jury must deal in terms of probabilities.

The defendants point to gaps in the proof, such as the absence of evidence of the speed of the bicycle proceeding down the hill, of the condition of the brakes and steering mechanism, and of the attentiveness of the rider. They also argue that there is no substantial evidence that the

4. *Green v. Kahn*, 391 S.W.2d 269 (Mo.1965); *Barker v. East Side Building Corporation*, 344 S.W.2d 299 (Mo.App.1960); *Hieken v. Eichhorn*, 159 S.W.2d 715 (Mo.App.1942).

5. *Rovegno v. San Jose Knights of Columbus Hall Ass'n*, 108 Cal.App. 591, 291 P. 848, 850 (Cal. Dist.Ct.App.1930) and *Collins v. Riverside Amusement Park Co.*, 61 Ariz. 135, 145 P.2d 853, 857 (1944) (whether failure to provide lifeguard was the proximate cause of drowning held to be issue for jury). *See also*, Prosser, Proximate Cause in California, 38 Cal.L.Rev. 369, 382–383 (1950).

bicycle was traveling at a speed of 16.4 miles per hour at the time of the collision. Then, as a backup, they argue that, based on Kelsey's own testimony, the bicycle could have crossed the bump at the rated speed of 10 miles per hour, and, for all that the evidence shows, could have accelerated to 16.4 miles per hour at the point of collision.

The defendants, however, would unreasonably circumscribe the jury's authority to draw inferences from the evidence. The figure of 16.4 miles per hour is based on expert opinion. The defendants did not challenge the expert's qualifications, nor did they present any contrary testimony. The jury could have accepted the 16.4 mile per hour figure. We lack the means for disagreeing with the expert. The jury also could have found that the bicycle, aided by the downhill grade, had reached a speed of 16.4 miles per hour or more by the time it entered the parking lot, that the rider made no attempt to check his speed, at least until he heard the shouted warning, and that, by that time, he was unable stop the bicycle soon enough to avoid the collision. These conclusions are not speculative; they are logical and permitted inferences from the evidence.

The jury, indeed, could have found that the bicycle was traveling substantially faster than 16.4 miles per hour at the time it reached the level of the parking lot and that the rider was in the process of applying the brakes as he struck the plaintiff, so that the bicycle traveled only a few feet after the collision. The jury might believe that the rider had heard the shouted warning and that, had the speed of the bicycle been checked by a bump, he could have brought it to a stop in time to avoid an accident.

The defendants also make much of Kelsey's testimony that, if the cycle were slowed to a speed of 3 to 4 miles per hour by the bump, it could reach a speed of 11 miles per hour at the point of impact. They suggest that, had there been a speed bump which could be crossed at 10 miles per hour, the rider might have been able to accelerate to 16.4 miles per hour at the time of the collision. If so, they argue, the speed bump would not have prevented the collision, and there is a fatal flaw in the evidence of causation. This argument is based on the unrealistic assumption that the rider, after crossing the bump, would then accelerate to the maximum degree. There may be some confusion in Kelsey's reference to a speed of 3 to 4 miles per hour, but the defendants should have addressed their uncertainties to the jury rather than to the appellate courts, and perceived gaps should have been flushed out in cross-examination. The jury could properly find that a speed bump would have slowed the cyclist, making it more likely that he would have heard a warning or would have seen the plaintiff in time to avoid the collision. An alternate finding could be that, if the rider approached the parking lot at full speed and in ignorance of the presence of the bump, or if he knew of the bump and still approached it without reducing his speed, the bicycle would have been propelled in the air in a direction in which it would not have presented a danger to the plaintiff.

We have expounded at some length on the implications of Kelsey's testimony to demonstrate that the jury could have believed a speed bump at the place he suggested could have greatly reduced the chance of an accident, either by slowing down the bicycle or shifting its direction. No more should be required. The law deals with probabilities. *Virginia D. v. Madesco, supra; Wright, supra,* pages 1809–1813. An analogy is found in *Racer v. Utterman,* 629 S.W.2d 387, 394 (Mo.App. 1981), in which Judge Gerald M. Smith opines that, in a "failure to warn" case, it is not necessary to show with certainty that the warning would have prevented the casualty. Also in line is our recent opinion in *Nesselrode v. Executive Beechcraft, Inc.,* 707 S.W.2d 371 (Mo. banc 1986), which approved a failure to warn submission, with regard to parts which could be improperly switched, even though it could not be said with certainty that warnings placed directly on the parts would have been seen

and heeded. Causation is an element of products liability cases just as it is of negligence cases, and so the cases just cited are pertinent.

Our conclusion is consistent with Missouri cases applying the "substantial factor" test of causation.[6] We find nothing in the literature cited by Judge Welliver or in the cases cited by diligent counsel which conflict with our conclusion. Returning to Judge Welliver's argument that the finding of duty is predominant, our holding is simply an application of the strong policy requirement that a landlord use due care in making common areas safe for tenants. This duty may require the use of appropriate safety devices. The jury is the arbiter of due care and reasonableness. One purpose of the law of torts is to encourage people to take precautions.

The dissent raises the spectre of liability of the landlord to a bicyclist who is injured by a speed bump. The suggestion interjects a foreign issue. The scope of the duty is very different from that of a landlord to a tenant. *Patterson v. Gibson*, 287 S.W.2d 853 (Mo.1956). Dividers, ties, and bumpers are usual in parking lots, and their presence does not furnish a basis for finding negligence. *Hopkins v. Sefton Fibre Can Co.*, 390 S.W.2d 907 (Mo.App. 1965).

The trial judge, quite properly, made a conditional ruling on the motion for new trial. He did not act on any discretionary ground but found that the plaintiff's verdict directing instruction[7] was not supported by the evidence. The defendants seek to justify this ruling by arguing absence of evidence of proximate cause. No arguments are made in addition to those tendered on submissibility. Inasmuch as we find that the plaintiff made a submissible case, we perceive no error in the verdict director. The grant of the new trial, then, was not proper.

The judgment is reversed and the case is remanded with directions to enter judgment on the verdict.

BILLINGS and RENDLEN, JJ., concur.

HIGGINS, C.J., concurs in separate opinion filed.

DONNELLY, WELLIVER and ROBERTSON, JJ., dissent in separate opinions filed.

HIGGINS, Chief Justice, concurring.

I concur in the opinion of Blackmar, J., which reverses the judgment for defendants notwithstanding the verdict for plaintiff and directs entry of judgment on the verdict.

---

6. On the "substantial factor" test of causation, *see* Restatement (Second) of Torts, § 431 (1965); *Ricketts v. Kansas City Stock Yards Co. of Maine*, 484 S.W.2d 216 (Mo. banc 1972); and *Todd v. Watson*, 501 S.W.2d 48, 52 (Mo.1973). *See also Giles v. Moundridge Milling Co.*, 351 Mo. 568, 173 S.W.2d 745, 750 (1943); *Stumpf v. Panhandle Eastern Pipeline Co.*, 354 Mo. 208, 189 S.W.2d 223, 227 (1945); and *Champieux v. Miller*, 255 S.W.2d 794, 797 (Mo.1953). We do not agree with Judge Donnelly's suggestion that the substantial factor test was devised to respond to the riddle of concurring events, each independently sufficient to cause the injury. The riddle would remain. The substantial factor test, rather, was intended to demonstrate that the precipitating cause (here the actions of the cyclist) is not necessarily the only legally sufficient cause. A cause which meets the substantial factor test is a cause in fact.

7. INSTRUCTION NO. 6

Your verdict must be for plaintiff if you believe:

First, there was no speed control bump at the curve at the bottom of the hill in the driveway and as a result the driveway was not reasonably safe, and

Second, defendants knew, or by using ordinary care could have known, of this condition, and

Third, defendants failed to use ordinary care to make the driveway reasonably safe, and

Fourth, such failure either directly caused injury to plaintiff or combined with the acts of Shawn Amsden to directly cause injury to plaintiff.

I file this separate opinion to distinguish this case from *Virginia D. v. Madesco Inv. Corp.*, 648 S.W.2d 881 (Mo. banc 1983), in which I joined Judge Welliver in dissent. Judge Welliver concluded that defendant had breached no duty owed to plaintiff because "[n]othing about previous incidents at the hotel suggests that defendant had a reasonable basis for anticipating the attack of which plaintiff complains." *Virginia D.*, 648 S.W.2d at 890 (Welliver, J., dissenting).

The existence of a duty "arise[s] out of circumstances and [is] based on 'foreseeability' or reasonable anticipation that harm or injury is a likely result of acts or omissions.... The question is not whether the particular injury under consideration should have been anticipated, but whether, after the occurrence, such injury then appeared to have been the reasonable and probable consequence of the negligent act or omission." *Gold v. Heath*, 392 S.W.2d 298, 303 (Mo.1965); *see also Hoover's Dairy, Inc. v. Mid-America Dairymen*, 700 S.W.2d 426, 431 (Mo. banc 1985).

The evidence in this case showed that plaintiff's father expressed his concern to the apartment manager over the dangers of the bicyclists riding down the driveway and that another tenant told the manager the bicyclists were dangerous. In each instance, the manager responded that she would "do what she could" or "check into it." The evidence also showed that a manager in residence had observed the bicyclists riding down the driveway. This evidence demonstrates that defendants had notice of the circumstances and could have reasonably anticipated that harm or injury was likely to result. The defendants had a duty to protect their tenants from this reasonably anticipated harm and because defendants took no steps to protect the safety of their tenants, they breached their duty.

DONNELLY, Justice, dissenting.

The four-year-old plaintiff was walking across the parking lot behind her apartment when struck by another child on a bicycle. The parking lot behind plaintiff's apartment is situated at the base of a steep driveway which neighborhood children use as a bicycle path. Plaintiff's expert testified that, based on the assumption that plaintiff flew 10–15 feet in the air after being struck and traveled 20 feet altogether from the point of impact, the bicycle which struck plaintiff was traveling a minimum speed of 16.4 miles per hour. Plaintiff's expert further testified that a bicycle could not have traveled over two strategically placed speed bumps at speeds in excess of ten miles per hour and that, so long as the bicycle rider traveled over the second speed bump at no more than three to four miles per hour, he would be unable to attain a speed in excess of eleven miles per hour at the point where plaintiff was struck. It was plaintiff's theory at trial that defendants were negligent in failing to make the parking lot safe by installing speed bumps. Following a jury award for plaintiff in the amount of $850,000, the trial court entered judgment for defendants notwithstanding the verdict.

The issue here is one of allocation of loss.

"The mere fact that injury follows negligence does not necessarily create liability. A causal connection must be established between the negligence charged or submitted and the loss or injury sustained, such that the injury would not have happened *but for* the negligence, and also that the negligence was not only a cause but was a *proximate cause.*" *Branstetter v. Gerdeman*, 364 Mo. 1230, 1237, 274 S.W.2d 240, 245 (1955) (emphasis supplied). The "but for" or *"sine qua non"* rule of causation may be stated as follows: "The defendant's conduct is a cause of the event if the event would not have occurred but for that conduct; conversely, the defendant's conduct is not a cause of the event, if the event would have occurred without it." Prosser & Keeton on Torts 266 (5th ed. 1984).

In the present case the jury would be required to speculate to make a determination that defendants' alleged negligence as submitted—the failure to install speed

bumps—was a cause of plaintiff's injury. The evidence does not support the inference that plaintiff's injuries would not have occurred *but for* the lack of speed bumps. There is no evidence as to how much the speed bumps would have had to slow the bicycle in order for the rider to have avoided plaintiff's injuries. Absent such evidence, the jury could not, as the principal opinion asserts, "properly find that a speed bump would have slowed the cyclist, making it more likely that he would have heard a warning or would have seen the plaintiff in time to avoid the collision." *Cf. Bass v. Bi-State Development Agency*, 661 S.W.2d 609 (Mo.App.1983).

Nor is recovery justified in this case by operation of the so-called "substantial factor" test of causation. The "substantial factor" test was developed as a framework for analysis for the relatively infrequent situation in which two causes concur to bring about an event and either one of them, operating alone, would have been sufficient to cause the plaintiff's injury. Prosser & Keeton on Torts, 268 (5th ed. 1984). Where, as here, the alleged negligence of the defendant (in failing to install speed bumps) could not, operating alone, have caused plaintiff's injury, causation may be determined in accordance with the traditional rules of "but for" and "proximate" causation without resort to "substantial factor" analysis. *Id.* Even under "substantial factor" analysis the defendant's negligent conduct "is not a substantial factor in bringing about harm to another if the harm would have been sustained even if the actor had not been negligent." Restatement (Second) of Torts, § 432(1) (1965).

In short, plaintiff may not recover under the traditional analyses made in terms of causation. Nevertheless, the majority, in a case involving alleged nonfeasance, demonstrates minimal, if any, concern for fault and neuters the much-used concept that it is the duty of a trial court to direct a verdict for the defendant where causation is a matter of pure speculation and conjecture. More important, it renders irrelevant *the question* "whether the defendant

should be legally responsible for the injury." Prosser & Keeton on Torts 273 (5th ed. 1984). I recognize that attempts to deal with *the question* in terms of causation have "led and can lead * * * to utter confusion." *Id.* The majority opines: "Striving for certainty is a *tour de force*. The jury must deal in terms of probabilities. * * * One purpose of the law of torts is to encourage people to take precautions." *The question* remains untouched.

"It is sometimes said that compensation for losses is the primary function of tort law and the primary factor influencing its development. It is perhaps more accurate to describe the primary function as one of determining when compensation is to be required. Courts leave a loss where it is unless they find good reason to shift it. A recognized need for compensation is, however, a powerful factor influencing tort law. Even though, like other factors, it is not alone decisive, it nevertheless lends weight and cogency to an argument for liability that is supported also by an array of other factors." Prosser & Keeton on Torts 20 (5th ed. 1984).

It must be obvious to those who care that the majority is bent on making *the need for compensation* the overwhelming function of the law of torts in Missouri. *See e.g., Virginia D. v. Madesco Investment Corp.*, 648 S.W.2d 881 (Mo. banc 1983); *Elmore v. Owens-Illinois, Inc.*, 673 S.W.2d 434 (Mo. banc 1984); *Fowler v. Park Corp.*, 673 S.W.2d 749 (Mo. banc 1984); and *Nesselrode v. Executive Beechcraft, Inc.*, 707 S.W.2d 371 (Mo. banc 1986).

I must again respectfully dissent. "The tendency of principle and rule to conform to moral standards, which is a true avenue of growth for law, is not to be confounded with the suspension of all principle and rule and the substitution of sentiment or unregulated benevolence, which, pushed to an extreme, is the negation of all law." B. Cardozo, The Paradoxes of Legal Science (1928).

In my view, "where persons contribute to cause an occurrence, and damage is suf-

fered, each should bear responsibility only in proportion to his fault." *Steinman v. Strobel*, 589 S.W.2d 293, 296 (Mo. banc 1979) (Donnelly, J., dissenting). My brothers have every right to disagree: "What one judge most earnestly believes to be the right method is met by the challenge of men as able and conscientious who say it is the wrong one." B. Cardozo, The Growth of the Law (1924). However, they should not excise the question of *legal* responsibility from the law of torts.

WELLIVER, Judge, dissenting.

I respectfully dissent.

Under the guise of avoiding "unreasonably circumscribing" the function of the jury, the principal opinion abdicates the judicial function of deciding as a matter of law whether the case should have been submitted to the jury. Both the trial court and the court of appeals properly exercised this judicial function when they decided that this case should not have been submitted to the jury.

It is axiomatic that a party must plead and then prove each element of the cause of action by a preponderance of the evidence. Traditional negligence law requires that a party must establish a "(1) legal duty on the part of the defendant to conform to a certain standard of conduct to protect others against unreasonable risks; (2) a breach of that duty; (3) a proximate cause between the conduct and the resulting injury; and (4) actual damages to the claimant's person or property." *Hoover's Dairy, Inc. v. Mid-America Dairyman, Inc.*, 700 S.W.2d 426, 431 (Mo. banc 1985). There is a general duty upon landowners to make common areas within the premises

reasonably safe.[1] *See generally* J. Page, The Law of Premises Liability, § 9.24 at 217 (1976 and Cum.Supp.1985–86); Annot., Landlord's Liability for Injury or Death Due to Defects in Outside Walks, Drives, or Grounds Used in Common By Tenants, 68 A.L.R.3d 382 (1976). *See e.g., Barker v. East Side Bldg.*, 344 S.W.2d 299 (Mo.App. 1960); *Hieken v. Eichhorn*, 159 S.W.2d 715 (Mo.App.1942).

The principal opinion focuses on but one of the elements, causation, and holds that it is sufficient that the jury could have believed or found that installation of a speed bump *could have* "greatly reduced the chances of an accident." This conclusion is said to be supported by the testimony of an expert witness, whose testimony, to say the least, is dubious and without an adequate foundation in the record.[2] There is *no* burden on the defendant to refute or to present contrary evidence. Under such circumstances, the trial court judge who has listened to the evidence and witnesses is under a duty to determine whether, as a matter of law, the case should be submitted to the jury.

> The plaintiff must introduce evidence which affords a reasonable basis for the conclusion that it is more likely than not that the conduct of the defendant was a cause in fact of the result. A mere possibility of such causation is not enough; and when the matter remains one of pure speculation or conjecture, or the probabilities are at best evenly balanced, it becomes the duty of the court to direct a verdict for the defendant.

W. Prosser & P. Keeton, Prosser and Keeton on Torts, 269 (1984). The court here

---

1. When acknowledging this general duty, the principal opinion suggests that the duty is "strongly emphasized in recent cases." Such a suggestion only serves as a mode of "considerate communication" by using a subtle twist on language. *See* Weisberg, How Judges Speak: Some Lessons On Adjudication In *Billy Budd, Sailor* With an Application to Justice Rehnquist, 57 N.Y.U.L.Rev. 1 (1982).

2. The expert's testimony is based upon hypothetical facts that have little support in the record. The witness to the accident testified that the

child traveled "several" feet after the collision and previously had told a hospital attendant that the child flew ten feet. The expert, however, based his calculation on the assumption that the child traveled twenty feet. It is not enough to suggest that respondents should have questioned him about the effect on his opinion had the child not traveled twenty feet. Respondents vigorously objected to this testimony and the hypothetical was without an adequate foundation.

directed a verdict, and this Court should not, on the meager evidence presented at trial, substitute its judgment for that of the trial court and reinstate the verdict.

Causation is not the central question in this case; rather, the inquiry should focus on the scope of respondents' duty to this particular plaintiff. "If the other issues are not clearly formulated there is a great danger that they will become confused with the cause issue and convert it in a twinkling into some other issue underlying responsibility." Green, The Causal Relation Issue In Negligence Law, 60 Mich.L.Rev. 543, 546 (1962). The concept of causation has evoked considerable controversy among the scholars during the last sixty years.[3] The necessary "causal" connection is usually referred to as proximate cause, a term of art, according to Prosser and Keeton, upon which "nothing in the entire field of law ... has called forth more disagreement, or upon which the opinions are in such a welter of confusion." W. Prosser & P. Keeton, *supra*, § 41, at 263. Another observer has suggested that "the phrases of proximate cause are little more than gaudy ribbons with which the package of liability may be decorated once its contents have already been fixed by the court through resort to some other mystique."

Malone, Ruminations on Dixie Drive It Yourself Versus American Beverage Company, 30 La.L.Rev. 363, 364 (1970).

Today, proximate cause theory is separated into two components: a necessary *factual* connection and a boundary based upon justice or policy within which liability can be imposed. W. Prosser & P. Keeton, *supra*, § 41 at 264. In a pathbreaking analysis, however, Wex Malone illustrated the difficulty with trying to draw a fine line between *factual* and *legal* components of "causation." Malone, Ruminations on Cause-In-Fact, 9 Stan.L.Rev. 60 (1956). *But cf.* Wright, Causation in Tort Law, 73 Calif.L.Rev. 1735, 1803 (1985). As a philosophical matter, "the consequences of an act go forward to eternity, and the causes of an event go back to the dawn of human events, and beyond." W. Prosser & P. Keeton, *supra*, § 41 at 264. Yet, no one would seriously contend that Orville Wright "caused" all modern day aviation disasters. By the same token, no one would suggest that the person who taught Shawn Amsden how to ride a bicycle "caused" the accident even though it was a necessary antecedent.

In an effort to develop meaningful standards by which to measure causation,

**3.** *See generally* A. Becht & F. Miller, The Test of Factual Causation (1961); L. Green, Rationale of Proximate Cause (1927); H.L.A. Hart & T. Honore, Causation in the Law (1959); R. Keeton, Legal Cause in the Law of Torts (1963); Beale, The Proximate Consequences of an Act, 33 Harv.L.Rev. 633 (1920); Carpenter, Concurrent Causation, 83 U.Pa.L.Rev. 941 (1935); Carpenter, Workable Rules for Determining Proximate Cause, 20 Calif.L.Rev. 229, 396, 471 (1932); Crowe, The Anatonomy of a Tort—Greenian, as Interpreted by Crowe, Who has Been Influenced by Malone—A Primer, 22 Loy L.Rev. 903 (1976); Grady, Proximate Cause and the Law of Negligence, 69 Iowa L.Rev. 363 (1984); Green, The Duty Problem in Negligence Cases, 28 Colum.L. Rev. 1014 (1928); Green, Duties, Risks, Causation Doctrines, 41 Tex.L.Rev. 42 (1962); Green, Are There Dependable Rules of Causation?, 77 U.Pa.L.Rev. 601 (1929); Henderson, A Defense of the Use of the Hypothetical Case to Resolve the Causation Issue—The Need for an Expanded, Rather than Contracted, Analysis, 47 Tex.L. Rev. 183 (1969); Landes & Posner, Causation in Tort Law: An Economic Approach, 12 J. Legal Stud. 109 (1983); Malone, Ruminations on Cause-in-Fact, 9 Stan.L.Rev. 60 (1956); Peaslee, Multiple Causation and Damage, 47 Harv.L.Rev. 1127 (1934); Phillips, Reflection on Factual Causation, 1978 Wash.U.L.Q. 661; Prosser, The Minnesota Court on Proximate Cause, 21 Minn. L.Rev. 19 (1936); Prosser, Proximate Cause in California, 38 Calif.L.Rev. 369 (1950); Rizzo, The Imputation Theory of Proximate Cause: An Economic Framework, 15 Ga.L.Rev. 1007 (1981); Rizzo & Arnold, Causal Apportionment in the Law of Torts: An Economic Theory, 80 Colum.L.Rev. 1399 (1980); Thode, Tort Analysis: Duty-Risk v. Proximate Cause and the Rational Allocation of Functions Between Judge and Jury, 1977 Utah L.Rev. 1; Thode, The Indefensible Use of the Hypothetical Case to determine Cause in Fact, 46 Tex.L.Rev. 423 (1968); Wright, Causation in Tort Law, 73 Calif.L.Rev. 1737 (1985); Zweir, "Cause in Fact" in Tort Law—A Philosophical and Historical Examination, 31 DePaul L.Rev. 769 (1982); Comment, When Cause-In-Fact is More Than A Fact: The Malone-Green Debate on the Role of Policy in Determining Factual Causation in Tort Law, 44 La.L.Rev. 1519 (1984).

courts and commentators established certain tests, such as the "but for" and "substantial factor" tests. There is disagreement, however, over whether such tests should be considered as tests for "legal" or "factual" causation. Prosser & Keeton treat such standards as tests for "factual" causation. W. Prosser & P. Keeton, *supra*, § 41. The Restatement (Second) of Torts § 432 apparently treats such tests under the rubric of "legal" cause. These tests are referred to as hypothetical counter-factual questions designed to determine what would have occurred without the alleged negligent conduct. The "but for" test, for example, provides that the conduct of the defendant caused the event if the event would not have occurred but for the defendant's conduct. The "substantial factor" test is merely the adoption of the "but for" test when there are multiple *sufficient* causes of an event:

> If two forces are actively operating, one because of the actor's negligence, the other not because of any misconduct on his part, and each of itself is sufficient to bring about harm to another, the actor's negligence may be found to be a substantial factor in bringing it about.

Restatement (Second) of Torts § 432(2). Although these tests might be appropriate in many cases, they are woefully inadequate in the hard cases. Aside from the philisophical question of whether "act" and "omission" overlap, these tests cannot explain the situation where there is an affirmative act by a third party and a failure to act (nonfeasance) by another, such as in the case at bar. The Restatement attempts to resolve such cases by suggesting that "if the same harm, both in character and extent, would have been sustained even had the actor taken the required precautions, his failure to do so is not even a perceptible

factor in bringing it about and cannot be a substantial factor in producing it." Restatement (Second) of Torts § 432 Comment b. This tells us very little and is simply a test of exclusion.[4]

For decades, many of the leading scholars in this area have urged courts to abandon this "orthodox" view of causation, at least in hard cases, and shift the focus of the inquiry to the scope of the defendant's duty. The question of causation should be limited to determining whether the conduct at issue *contributed to* the injury. The courts should decide whether the cause is one for which liability should be imposed. Green, The Causal Relation Issue in Negligence Law, 60 Mich.L.Rev. 543 (1962); Malone, Ruminations on Cause-In-Fact, 9 Stan. L.Rev. 60 (1956); Comment, When Cause-In-Fact Is More Than A Fact, 44 La.L.Rev. 1519 (1984). Foreseeability alone is not sufficient; foreseeability makes the conduct negligent, but other factors and policy judgments determine the scope of the duty.

In the case at bar, I do not believe that the scope of respondents' duty extended to the placement of speed bumps on its property. The only evidence at trial indicating that speed bumps should have been placed in the parking lot came from appellant's expert witness, who indicated that speed bumps might prevent bicyclists from traveling too fast in the parking lot. It might be said that a wall, fence, sign or security patrol might have had the same effect. Yet, no one suggests that respondents should have built a wall around the parking lot. The precise question, rather, is whether respondents' owed appellant or someone similarly situated the specific duty alleged in appellant's pleading—that is, placing a speed bump on the property—in order to

---

**4.** "Factual" causation also poses theoretical problems in cases based upon vicarious liability. In recent years, following the wake of *Summers v. Tice,* causation has been a subject of litigation in alternative liability situations such as the DES cases. *See e.g., Zaft v. Eli Lilly Co.,* 676 S.W.2d 241 (MO. banc 1984). *See generally,* Delgado, Beyond *Sindell:* Relaxation of Cause-in-Fact Rules for Intedeterminate Plaintiffs, 70 Calif.L.Rev. 881 (1982); Kaye, The Limits of the Preponderance of the Evidence Standard: Justifiably Naked Statistical Evidence and Multiple Causation, 1982 A.B.A.Res.J. 487; Miller, Market Share Liability In Drug Cases, 41 J.Mo.Bar 359 (1985); Robinson, Multiple Causation in Tort Law: Reflections on the DES Cases, 68 Va.L.Rev. 713 (1982).

prevent the accident herein from occurring.[5]

The principal opinion suggests that this is a question for the jury, and that the jury could have believed the one expert's [6] opinion that speed bumps might be appropriate to control bicycle traffic. It then opines "i[t] would be contrary to the course of the law for us to substitute our judgment for that of the jury." I believe that such a view unwisely delegates too much discretion to the jury and overlooks one of the most fundamental principles of tort law—that is, that the question of duty is ultimately one of policy for the courts.

The hazards to which any interest is subjected are so numerous, and the reach of any rule which the plaintiff may invoke in its vindication is so poorly defined, and there are so few external guides to tell a court whether a particular hazard is within the range of the rule invoked, that the problem may well prove bewildering. Nevertheless, the court must determine it in every case, consciously or otherwise.

The judicial power cannot function in any other way. It is a problem solely for the judge and the jury has no party to play in its determination.

L. Green, Rationale of Proximate Cause 12 (1927). In short, this is a legal question and an appropriate matter for the trial court to decide either through a directed verdict or a j.n.o.v. *See* L. Green, Judge and Jury (1930); Thode, Tort Analysis: Duty-Risk v. Proximate Cause and the Relational Allocation of Functions Between Judge and Jury, 1977 Utah U.L.Rev. 1. At the close of appellant's case, respondent moved for a directed verdict, and the trial court indicated that it was a close case but that he would let the case go to the jury anyway and would reconsider the matter in a j.n.o.v. After the verdict, the court granted the j.n.o.v.

This action by the trial court was appropriate. Common sense suggests that the scope of respondents' duty does not extend to the placement of speed bumps on its property.[7] While it may be that speed

5. The initial question in virtually all negligence cases is whether the defendant owes the plaintiff any duty. Here, there is a general duty to make the premises "reasonably safe." The next question is whether the absence of speed bumps made the property "unreasonably safe" in light of the risk being sought to avoid—that is, a child being seriously hurt by a bicycle traveling in the parking lot. Answering this second question defines the *scope* of the respondents' duty.

6. The expert was apparently qualified as an accident reconstructionist, and there was no specific objection to the opinion on the need for speed bumps.

7. The principal opinion suggests that this case is akin to the situation where a child drowns in a public swimming pool without a lifeguard on duty. In either case, causation plays only a minimal role because in both situations the jury could conclude that it is "more likely than not" that the omission (the alleged tortious conduct) contributed to the injury. It might be noted that the principal opinion alters this test by suggesting that the "more likely than not" standard need only increase the risk of the accident. This is an issue over which the tort system has yet to deal with adequately; and, while there is an emerging concept of comparative causation and valuation of risk (or chance), such as in the failure to diagnose medical malpractice cases, this concept has not yet received widespread

recognition. *See generally* King, Causation, Valuation, and Chance in Personal Injury Torts Involving Preexisting Conditions and Future Consequences, 90 Yale L.J. 1353 (1981); Note, Increased Risk of Harm: A New Standard for Sufficiency of Evidence of Causation in Medical Malpractice Cases, 65 B.U.L.Rev. 275 (1985); Note, Medical Malpractice: The Right to Recover for the Loss of a Chance of Survival, 12 Pepp.L.Rev. 973 (1985).

The crucial question, however, is whether in each situation the defendant's duty encompasses the risk. Surely no one would disagree that lifeguards are necessary or important for protecting swimmers from drowning, but it is a wholly different matter to suggest that speed bumps are necessary or important for protecting against the risk that children might be seriously injured by bicyclists. This inquiry is not the same as whether the speed bump could be necessary to protect people from being hit by speeding cars, such as in the case of *Clifton v. Brown*, 253 Ark. 148, 484 S.W.2d 884 (1972). It may well be that speed bumps should be equally necessary to prevent accidents involving bicyclists, but the flaw in the case now before this Court is the lack of sufficient evidence establishing that speed bumps fall within the scope of the duty. There is no evidence of what is required under local ordinances, the standards for building permits and other such evidence concerning the use of speed bumps.

bumps are a generally accepted safe method for slowing fast-moving noisy traffic in subdivisions, I have grave doubts about speed bumps being an appropriate device for slowing bicycles cutting across property. Under a tort theory as suggested by the principal opinion, couldn't a jury find that a speeding bicyclist injured after striking such an obstruction is just as much entitled to recovery against the landowner as this appellant?

The appellant failed to establish her case by a preponderance of the evidence and the trial court's granting of the j.n.o.v. should be affirmed.

ROBERTSON, Judge, dissenting.

I respectfully dissent.

This case takes us to the outer boundaries of causation. The facts are compelling; the injury cries out for compensation. The critical question, however, is whether these defendants' failure to install a speed bump in the parking lot is a sufficient cause of the injuries sustained by Kimberly Ann Jackson to require defendants to compensate her. Because I do not believe that plaintiff has shown the necessary causal connection between the absence of the speed bump and the injuries sustained, I dissent.

The critical element in the trial of this case was the testimony of plaintiff's expert, a consulting mechanical engineer. The expert testified that the speed of the bicycles at the time of impact was 16.4 miles per hour. Although there was no evidence as to how much a speed bump would have slowed the bicycles, he testified that a properly designed speed bump would have caused the bicycles to "become airborne" at speeds of greater than 10 miles per hour. He also testified that, assuming the bicycles had crossed the speed bump at 3 to 4 miles per hour, they could have accelerated to approximately 11 miles per hour before reaching the plaintiff's path. I have no reason to doubt the expert's testimony.

The expert testified that the purpose of a speed bump is to control the speed at which the bump can be crossed. However, the expert did not testify, and there is no other reason to believe, that a speed bump would have prevented these bicycles from riding down the parking lot. Therefore, it is a given fact that under the circumstances of this case, irrespective of whether a speed bump exists, the paths (expressed as lines) of the two pertinent actors would have crossed. The introduction of a speed bump would have had either of two different consequences: first, it could have changed the moment in time at which the bicycle's path intersected that of the plaintiff, by reducing the bicycle's speed at the location of the speed bump; second, it could have changed the location at which the plaintiff's and the bicycle's paths intersected, by requiring the bicycle to alter its angle of approach to the dirt path from the top of the drive.

In the first instance, the speed bump provides no more than a wrinkle in time, causing the bicycle to arrive at the inevitable intersection with Kimberly's path at a slightly later time. It may be inferred that if this delay were significant enough, Kimberly would likely have passed beyond the intersection during this added moment. However, under such a scenario, the absence of a speed bump is no more a "cause" of the collision than is the failure of the boys, even for a moment, to delay their departure from the top of the hill, or the act of Kimberly's mother in sending her to get her father at the particular instant she did. Any such factor with the capacity to cause a momentary change in the time sequence has an equivalent potential to prevent the accident, and is therefore equally "causative." The absence of a speed bump simply combined with a wide universe of events (both those which happened and those which could have, but did not) to allow the forces set in motion by the boys and Kimberly's mother to merge into tragedy.

Conversely, the causative significance of the speed bump must be viewed in the context of all those factors which, assuming the speed bump were in place, could

have operated to offset the delay it caused, placing both actors back on the same collision course which actually occurred in the present case—in effect, an offsetting wrinkle in time. Therefore, I cannot agree that the absence of a speed bump was a "cause" of this accident under the first scenario.

In the second instance, the speed bump alters the intersection of Kimberly's path and that of the bicycle's. Again, however, the accident happens or fails to happen depending not on whether the speed bump is in place, but upon when Kimberly leaves the apartment, how quickly she walks, and when the boys depart the hill, and the angle and speed of the descent. The mere fact that this accident may have been avoided by a change in timing does not provide the necessary predicate for defendants' causal responsibility in this accident.[1]

In determining causation, "[t]here is in truth little to guide us other than common sense." *Palsgraf v. Long Island Railroad Co.*, 248 N.Y. 339, 162 N.E. 99, 104 (1928) (Andrews, J. dissenting). Here, the speed bump does not provide enough effect, in terms of preventing the boys' negligence, to render its absence a legally sufficient cause of the collision. Such a "cause" is too attenuated, too remote, to impose liability on these defendants.[2]

In an appropriate case, I would consider the adoption of the "substantial factor" standard for causation. However, such an opportunity does not arise in the present case, as the conduct of each putative wrongdoer, acting alone, would not have been sufficient to cause the accident. Prosser & Keeton on Torts, 266 (5th ed. 1984).

For the reasons stated, I would affirm the judgment n.o.v. entered in favor of defendants by the trial court.

1. Even were the speed bump to produce a combined time and place alteration, which in all likelihood it would have produced, the fact remains that the paths of these actors would have crossed.

2. As an additional point in this regard, were the situation inverted so that a speed bump actually

had been placed in the driveway, plaintiff could well have argued that defendants were negligent in *this* respect. In such a case, the argument would be that the speed bump encouraged the boys to race across the bump in order to experience the exhilaration of being lofted into the air on their bicycles.